IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DEVI NAMPIAPPARAMPIL

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-against-

AMY LOPREST

DAVID DUHALDE

HANNAH EGERTON + please see attached

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*

AMENDED
**Complaint for Violation of Civil Rights**
(Non-Prisoner Complaint)

Case No. 23 - cv - 3947 - pkc - LB
*(to be filled in by the Clerk's Office)*

Jury Trial: ☑ Yes ☐ No
*(check one)*



RECEIVED
JUN 02 2023
PRO SE OFFICE

NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in *forma pauperis*.

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | DEVI NAMPIAPARAMPIL |
| Street Address | 111 JOHN STREET |
| City and County | NEW YORK, NY |
| State and Zip Code | NY 10038 |
| Telephone Number | (212) 409-1800 |
| E-mail Address | devichechi@gmail.com |
| | DrDevi FOR NYC@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | AMY LOPREST |
| Job or Title (if known) | EXECUTIVE DIRECTOR NYC CAMPAIGN FINANCE BOARD |
| Street Address | |
| City and County | NEW YORK, NY |
| State and Zip Code | NY 10007 |
| Telephone Number | |
| E-mail Address (if known) | |

2

**Defendant No. 2**

Name — DAVID DUHALDE

Job or Title (if known) — SENIOR CANDIDATE SERVICES LIASON NYC CAMPAIGN FINANCE BOARD

Street Address — 100 CHURCH STREET 12TH FLOOR

City and County — NEW YORK, NEW YORK

State and Zip Code — NY 10007

Telephone Number — (212) 409-1800

E-mail Address (if known) — DDuhalde @ nyccfb.info

**Defendant No. 3**

Name — HANNAH EGERTON

Job or Title (if known) — DIRECTOR OF CANDIDATE SERVICES NYC CAMPAIGN FINANCE BOARD

Street Address — 100 CHURCH STREET 12TH FLOOR

City and County — NEW YORK, NEW YORK

State and Zip Code — NY 10007

Telephone Number — (212) 409-1800

E-mail Address (if known) — hegerton@ nyccfb.info

**Defendant No. 4**

Name — FREDERICK SCHAFFER

Job or Title (if known) — CHAIR, CAMPAIGN FINANCE BOARD

Street Address — 100 CHURCH STREET 12TH FLOOR

City and County — NEW YORK, NEW YORK

State and Zip Code — NY 10007

Telephone Number — (212) 409-1800

E-mail Address (if known) —

additional
defendants —
please see
attached

3

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.  Are you bringing suit against *(check all that apply)*:

☑ State or local officials (a § 1983 claim)

☐ Federal officials (a *Bivens* claim)

B.  Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

1st AMENDMENT - FREEDOM OF SPEECH

4TH AMENDMENT - UNLAWFUL SEIZURE

8TH AMENDMENT - No EXCESSIVE FINES NOR CRUEL +

14TH AMENDMENT - RIGHT TO DUE PROCESS + EQUAL PROTECTN
(UNUSUAL PUNISHMENTS)

C.  Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

_____

_____

_____

D.  Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Please see attached

_____

_____

4

**III. Statement of Claim**

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. Where did the events giving rise to your claim(s) occur?

Please see attached

B. What date and approximate time did the events giving rise to your claim(s) occur?

Please see attached

C. What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

Please see attached

5

IV. **Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Please see attached

V. **Relief**

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Please see attached

VI. **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

6

**A.** **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 6 / 2 , 20 23

Signature of Plaintiff _____

Printed Name of Plaintiff _DEJI NAMPIAPARAMPIL_

**FULL LIST OF DEFENDANTS:**

**Amy Loprest**

**David Duhdalde**

**Hannah Egerton**

**Frederick Schaffer**

**Bethany Perskie**

**Of**

**The New York City Campaign Finance Board**

---

**Defendant No. 5**

Bethany Perskie

General Counsel, NYC Campaign Finance Board

100 Church Street 12th Floor

New York, New York

NY 10007

(212) 409-1800

bperskie@nyccfb.info

**Defendant No. 6**

The New York City Campaign Finance Board

100 Church Street 12th Floor

New York, New York

NY 10007

(212) 409-1800

- Of note, I am listing these individuals' official work address. However, they were "working from home" at the time of the events described. Loprest, Duhalde, Egerton and Perskie lived and worked in Kings County.

---

**Act 1 :**      **Date of Occurrence: January 11, 2022; ONGOING**

                **Date of Discovery: May 22, 2023**

                **Place of Occurrence: Due Process Violation: Kings County, Richmond County,**

                **Queens County, New York County and Bronx County**

                **Place of Occurrence: Dormant Commerce Claim: New Jersey, Connecticut, Massachusetts, Vermont, New Hampshire, Maine, Pennsylvania, Maryland, Washington, D.C., Ohio, Illinois, Florida, Georgia, Alabama, Oregon, Arizona, Wyoming, and Texas**

**FACTS:**

I was a candidate for office in the 2021 New York City Public (NYC) Advocate race. The election took place on November 2, 2021. I lost the election and conceded to my opponent the same night. Coming out of the election, the Campaign Finance Board (The_CFB), which reviews NYC campaigns for signs of money laundering and fraud, reported finding ZERO (0) outstanding campaign finance violations in its review of my campaign. (I was aware of one campaign finance violation, which I freely disclosed, but was not sure how serious it was). Therefore, while working from her home, my CFB liaison (Jaclyn Williams) told me as the Candidate and Campaign Manager, to close my campaign bank account, which I did. She told me I would be able to stop filing financial disclosure statements with the CFB since my campaign no longer had any assets.

The_CFB did not allow me to stop filing these disclosure statements even though there was no new activity at that time. Of note, if I ever forgot (or will forget in the future) to file any forms or made any errors at any time with their proprietary software, those errors could and can be used against me in any investigations or proceedings. As of 5/25/23, I am still required to file these forms as I cannot figure out how to terminate the filings.

Jaclyn Williams also informed me that legal expenses were considered an official campaign expense. Since my campaign was out of money, the campaign would not be able to spend money on an attorney. Any contributions from other sources would be considered a contribution, which would not be

allowed since the fundraising period had passed. <u>Jaclyn Williams told me I could not use my own personal funds to hire an attorney because that would be considered a campaign contribution and I had already reached the maximum allowed contribution to my campaign. Any payments I made to an attorney could incur prosecution and penalties by The_CFB.</u>

These penalties could damage my professional reputation as a physician and go on my record with the Board of Medicine, not only in New York, but across the country since I am licensed through the Federal Credentialing Verification Service. I cannot risk having these campaign finance violations tarnishing my professional record as a physician, a laboratory scientist, or a professional who works with radiation and radioactive materials. These are my three government-issued professional licenses.

In September 2022, I filed a Summons and Complaint against The_CFB in New York State Supreme Court for negligence with respect to certain acts and libel with respect to a voter guide it published. I filed as a pro se unrepresented litigant. I did not hire an attorney because I was under the false assumption that I could incur campaign finance penalties, imposed by the Defendant, if I retained counsel. I only discovered the statements made by the CFB were likely false after speaking to a pro bono attorney at the U.S. District Court office on 5/22/23.

After I filed my Complaint, in October 2022, the CFB abruptly discovered that my campaign had made potentially over 75 new campaign finance violations. I was forced to respond to this investigation and audit, and attest to several financial records in a web platform I did not understand, without an accountant or an attorney. It took me hundreds of hours because I could not outsource any of the overly burdensome tasks that The_CFB assigned to me, including tasks akin to moving a receipt from Line A to Line B in the same transaction. This involved primarily data entry, downloading and uploading attachments in a web platform that I was not familiar with. Prior to that, I had made over 10 requests for technical assistance from Information Technology (IT) but the only person the CFB would assign to help me was one of the people I had accused of malice in my ongoing libel suit: Hannah Egerton. Before critical deadlines in my libel suit, this employee would send me threatening emails about my audit.

During one of our virtual meetings, Egerton told me I could correct one of the audit issues (outstanding liabilities) by clicking on the button "Paid." She told me to do this even though I did not have corresponding payments. As the owner of a medical private practice, I knew that would be fraud (insurance fraud if I did it in the bookkeeping for my business), so I did not follow that instruction. In a separate call, she later stated that a different button had to be clicked. In every call with The_CFB, I constantly had to use my past knowledge and experience to figure out if I could be tricked into committing a financial crime.

3

The message that Williams gave me was part of The_CFB's official policy. I received the same message during one of the mandatory training sessions I underwent at the start of my run for local office. In March 2021, under color of law, the CFB informed me that I had to undergo their mandatory training sessions or I would not be able to run for local office. During these mandatory training sessions, I was informed that legal, accounting and other professional expenses counted as campaign expenses. I was also informed that as a candidate, if I participated in Matching Funds A program (which I did), then I could only spend up to three times the maximum allowed contribution, which worked out to $6000.

Similarly situated candidates in my Public Advocate race are not being audited at all. The_CFB declined to audit them. Even candidates who received public funds (taxpayer monies)– which I did not– informed me they were **not** being audited. However, I have had approximately fifteen (15) CFB employees, approximately one-tenth of all CFB employees accessing my campaign records after my election concluded, according to The_CFB's response to one of my FOIL requests, suggesting they are participating in this investigation of my campaign.

I have been warned that I will receive a $2000 penalty for a net-zero contribution I received from a physician group. The American Society of Interventional Pain Physicians is a PAC registered with the FEC. The CFB requires that all PACs register with them before they contribute to any NYC campaign. On multiple occasions, executives and the executive assistant for this PAC called the CFB to find out how to register the PAC. CFB employees did not respond. I asked Jaclyn Williams via a Microsoft Teams meeting but she did not tell me. My Treasurer emailed Williams for the answer but Williams did not tell her. We returned the money to the PAC. Yet, as part of its official policy, The_CFB has assessed a $2000 penalty, payable to The_CFB, for receiving the check in the first place.

It did the same with another PAC contribution, where similarly, it refused to give us the information on how to register the PAC with The_CFB.

The_CFB also accused me of financial discrepancies related to "canceled" transactions– transactions where someone wanted to donate money but then immediately changed their mind where the transaction was immediately canceled on the credit card processing system. These were not refunds because the money never hit the campaign bank account. There was no discrepancy in reporting since we used The_CFB's reporting system, preferred credit card processing system, and website (NYC Votes) for the transactions. Yet the CFB still determined these transactions were irregular– even though they had never been questioned prior to the election.

Because The_CFB denied me the right to an attorney while threatening potential charges for financial crimes, I have had to represent myself as a pro se unrepresented litigant in several cases.

I have successfully represented myself, my mother (Mary Nampiaparampil) and my campaign Dr. Devi For NYC in ELEVEN (11) cases in OATH Court in 2022, even though the City appeared with an attorney. I was able to represent my mother because she and her doctors transferred her healthcare proxy and her legal power of attorney to me at that time. I could represent the Campaign (Dr. Devi For NYC) because I was the Candidate. I was able to represent all of us over that six-month period and obtain 11 dismissals.

I also had to represent myself, my dependent children aged 4 and 1 (A.T. and R.T.), and my business, of which I am the sole proprietor, in New York State Supreme Court. I was the Plaintiff against The_CFB. The claims I brought forward were dismissed without a hearing even though when I called the Court and asked how I should submit my video evidence, the Court clerk told me to bring my laptop to the hearing and play the videos at the hearing itself.

The majority of the exhibits I submitted (affidavits from witnesses, Court records, emails from the Defendant and others, photographs, and video evidence), to support my claims were excluded from review without any reason given for why, or any discussion on the matter. Moreover, I was preemptively denied leave to amend the Complaint because I had made a typographic error on a form. On the blank line asking for a Date, I wrote the Date that evidence of "malice" first appeared. I did not write the date that the libel occurred or the date where I discovered that libel had occurred, which was much later. Without a hearing, I had no opportunity to explain that I had made a typo. It was clear that it was a typo based on the dates provided in both my Complaint and my multiple affidavits. And because The_CFB had denied me due process and denied me the right to counsel for fear of prosecution for campaign finance violations, I had no idea how to address these issues.

I also have a witness who can testify on my behalf. One day before the harm actually occurred, this individual, who worked for the CFB, warned me that the CFB would harm me. This individual specified the manner in which I would be harmed– that technical problems would prevent me from being included in the CFB's voter guide. (I was unable to avoid the harm). That individual can testify as to the willful and premeditated nature of the CFB's actions. However, while that individual limits what information I can reveal, I am bound by confidentiality and patient privacy laws. I cannot safely and effectively navigate this legal landscape by myself as a physician. The_CFB is aware of this witness and is aware

that I have treated multiple CFB employees and their family members as patients. The whole situation is very complicated.

My relationship with The_CFB spans almost a decade since– when I first started dating my husband back in 2014– he was employed by The_CFB and he invited me to family and employee events with The_CFB. I also used to meet him at The_CFB for lunch a couple times a week. I have known many of these individuals for years prior to my run for office.

Having to represent myself in all of these different legal proceedings contemporaneously without any formal training as a lawyer has cost me a tremendous amount of time, resources and money. I am the income-earner in my medical-surgical practice. The time that I spend studying the law and working on these proceedings is time that I cannot treat patients and time that I cannot earn income. Nevertheless, I must still pay all of my employees. I have to pay the overhead for the practice. This has cost me a fortune and interfered with patient care, placing me at increased risk for medical malpractice claims. I am also essentially competing against the City with its nearly unlimited time, money, and resources.

My medical practice is a 100% minority-owned woman-owned business, of which I am the sole proprietor. It is registered in Westchester County with an address in New York County, and it attracts patients from states across the country, including my former patients from the Department of Veterans Affairs (VA Hospital) particularly during the pandemic. At the time I was running for office, we were offering Telemedicine visits to patients across the country. I offer medical consulting, educational and other services for corporations, government agencies, and national news networks across the country as the CFB knows. I have served as a medical expert witness to the City of New York for several years charging $675/ hour.

On numerous occasions, the named individuals (LDESPOT) interfered with this interstate commerce as part of their official policy. Aside from the acts I will describe in detail in this Complaint, under the color of law, on multiple occasions, Egerton asked me to block my practice to patients, thereby depriving patients of a doctor during a national emergency.

For example, although I had to show my passport and driver's license to open my campaign bank account and although I had to pass several federal background checks to work for the federal government, and although I had to pass more background checks to be issued a red passport to officially represent the U.S. interests by training foreign physicians in the Middle East and Asia, and although I officially ran for office in New York City in 2021, between April 2021 and May 2021, Egerton

determined *she could not verify my true identity*. Therefore, she sent me 8 notices over a 5 week period that I must sign consent forms in front of a notary that she had prepared.

This was completely contrary to her behavior throughout the election cycle. When the campaign could take a minor or ministerial action that could have a major benefit for me, the campaign or my business, she and the CFB generally failed to notify us. This happened with both the voter guide and the mandatory debate. In this case, however, with the election over, she was very aggressive about a triviality that could potentially harm me.

Second, my email response, which she acted upon because she read it, shows that she was fully aware that I believed I could not have attorney representation. My email to Egerton read, "It is not my fault that… the CFB's fundraising period has passed. Because the deadline has passed, I cannot raise funds to hire an attorney or accountant to advise me on this issue. It seems to me I should leave everything as is– and not raise the stakes by signing this verification form. If there is some significant benefit to me of signing the form, please show me the evidence of what this benefit is. I understand the CFB wants me to sign it– I don't understand what the benefit is to me." Elsewhere, I wrote, "You have asked me 8 times in 5 weeks to have this [sic] sign a verification form in front of a notary. I have no idea what the risks, benefits or alternatives are to making myself both the Candidate and the Treasurer for my campaign– especially when I am not a lawyer or an accountant myself. As a doctor, I would never pressure patients in this manner to sign consent forms they don't understand."

Egerton immediately responded by administratively making me both the Candidate and the Treasurer for my campaign without my signature on the consent forms.

I sent this email, dated May 18, 2022, to Egerton almost one month before I had to appear in OATH Court to defend myself against 11 false accusations against me and my mother that were ultimately dismissed, approximately 5 months before I filed my case in New York State Supreme Court, and almost 6 months before the CFB discovered over 75 financial discrepancies with my campaign that CFB employees had not found during the entire 2021 election cycle. In all these cases, I had to represent myself pro se, while still working as a physician during a pandemic, and all under the threat of being prosecuted for excessive campaign spending if I retained counsel.

ARGUMENT:

Under Section 1983, LDESPOT has violated my right to due process by depriving me of my right to counsel. It simultaneously interfered with interstate commerce giving rise to a dormant commerce

claim. There appears to be no law in New York State that bars me from having legal representation while I am being investigated for potential fraud and money laundering.

In all these instances, I have had to take time away from my business, Metropolis Pain Medicine d.b.a. Devi Nampiaparampil, M.D. to study the law to tackle all of this. My practice serves patients across the nation. I am licensed by the Federal Credentialing Verification Service and have held licenses in Vermont, New Hampshire, Massachusetts and worked for the Department of Veterans Affairs for years. I also have a business, Cytokine Press LLC, in Maricopa County, Arizona. In the midst of all of this, I was thwarted from becoming a partner in a business, Cytokine LLC, in Wyoming that I helped create.

Over my 20-year career as a physician teaching other physicians at national and international medical society meetings, publishing national bestselling textbooks on amazon within subcategories of academic medicine, I have established connections and influence across the country. My reputation and relationships with other physicians were also harmed by the CFB conducting investigations over physicians' $10 donations to my campaign. They could easily read 2021 Politico and New York Times articles, which reported that, in the same election cycle, in another citywide campaign, the CFB declined to investigate Andrew Yang's formal complaint against Eric Adams' over $900,000 being spent on postage. Instead, the CFB chose to investigate me for the financial discrepancy of missing an $8.96 receipt from Duane Reade.

The physicians who contributed to my campaign had to temporarily stop treating their patients during a pandemic, and sacrifice their potential income as well, to write letters to the CFB to explain their associations with me and explain their $10 contributions to my campaign. One of them was an interventional cardiologist working in Los Angeles, California who had to choose between dealing with the CFB and stenting patients in the cardiac catheterization lab with coronary artery disease. Another was a pediatric intensivist working in Chicago, Illinois who had to choose between dealing with the CFB and treating critically ill children in the Pediatric Intensive Care Unit (PICU). None of us have ever had our professional records tainted in any way.

Yet the CFB tarnished my reputation and career with overly burdensome tasks it placed on both me and my donors, that its decision-making employees stated only I could handle. This made donors and potential donors hesitate to interact with me. CFB stated that I could not outsource these tasks to others without risking being prosecuted– by the CFB itself– for campaign finance violations. In Pike vs. Bruce Church (1970), the Supreme Court stated, "If a legitimate local purpose is found [for interfering with interstate commerce], then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

In this case, there was no legitimate local purpose in the CFB employees' assigned tasks. If I could have outsourced these tasks, I would have asked a middle school or high school student to perform the data entry into the CFB's proprietary software and hired a lawyer to provide the necessary regulatory expertise. I would have been able to provide medical care to my *existing* 3500+ patients. During the time that I spent on basic data entry, my patients were deprived of a physician. My practice was deprived of COVID relief funds because I could not review all of the accounting and bookkeeping necessary to submit the applications. Without the funds, I could not employ additional staff or purchase more equipment and supplies, which deprived the state of more employment opportunities, payroll taxes, sales tax, and other economic activity.

If I could not hire an attorney, then that left open the possibility that errors I made during the audit could be due to a misunderstanding of the law rather than to true campaign finance violations. There is no public interest in prosecuting me for my confusion and misunderstanding. If I were to amass unnecessary campaign finance violations, that could cost me my medical license and deprive the state of a physician, laboratory scientist, and professional who works with radiation and radioactive materials. During COVID, I was one of the few physicians who worked throughout the lockdown. I worked everyday of the pandemic— including the day I was in labor with my second child and the day after birth to her via c-section. We have billing records from my hospital isolation room where I conducted telehealth visits while I myself was hospitalized for a combination of COVID and labor & delivery. I believe in service and sacrifice, which is why— with daycare closed— I sent my toddler away for eight (8) months in 2020 so I could treat the patients. I love my child but I did not see her at all during that time period. I knew I had to keep my vulnerable patients, the majority of my 3500 patients, out of the Emergency Rooms, where the original strain of COVID could be a death sentence for them.

In this case, the public interest was harmed all around by the CFB's official policy actions. Under Section 1983, the City is vicariously responsible for the actions of its employees because of its failure to supervise their actions.

---

**ACT TWO:** **Date of Occurrence: Sometime in September 2021 (Exact Date Unknown)**

**Date of Discovery: October 21, 2021**

**Place of Occurrence: Richmond County, Queens County, New York County,**

**Kings County,  and Bronx County; harm extending across county and state lines**

**FACTS:**

### 1. *Trojan Horse at the Campaign Finance Board*

According to his own LinkedIn profile, David Duhalde has been a partisan activist since 2002 when he first became involved with the Democratic Socialists. Since that time, he has become more engaged—increasing the number of their college chapters from 5 to 18 between 2006 and 2008. He claims he "established" the D.C. office for the Democratic Socialists of America (DSA) between 2015 and 2017, designed the DSA's national electoral strategy, managed the national political work, supervised the campus section, and served as one of the DSA's primary spokespersons. He has also worked as a booster and fundraiser for the DSA Fund to elect endorsed candidates.

Nowadays, Duhalde regularly promulgates violence. On 2/22/23, for example, Duhalde posted a picture of the Democratic Socialists of America (DSA) "North Star" pointing a gun at a U.S. astronaut. He advocated for the imminent realignment of the world through the destruction of the United States. Duhalde is an ostensibly white male who has aligned himself and posted pictures of himself with white "Maoists." He has praised Chairman Mao Tse-Tung, the Communist dictator known for his mass executions of millions of Asians. Duhalde has 10 publications in Jacobin, named after the French political party that spawned Robespierre and his "Reign of Terror" that guillotined approximately 17,000 enemies of "the Revolution." Duhalde himself has served as the Political Director of a group called "Our Revolution."

In 2018 and 2019, according to his own written statements, he worked with "Our Revolution" to select political candidates for endorsement. He also assisted the Working Families Party's candidates' to win primaries. These candidates would have included the 2018 and 2019, DSA-endorsed and Working Families' endorsed candidate, Jumaane Williams. Moreover, according to NYS Campaign Finance records, an individual with the last name "Duhalde" living at the same residence as David Duhalde, in the same apartment number as Duhalde, at the same time as Duhalde, was a campaign donor to "Jumaane For New York."

While engaging in some of these activities, Duhalde also worked as the Senior Candidate Services Liaison at the non-partisan NYC Campaign Finance Board (CFB). While working for The_CFB, according to his social media posts which I took timestamped screenshots of, Duhalde regularly campaigned and fundraised for the DSA. For example, on April 7, 2021, while acting as a "non-

10

partisan" government official overseeing campaign finance activity, he solicited funds for the partisan DSA. Duhalde publicly posted on Facebook a receipt of his political contribution to the DSA, then posted a link for others to contribute. He wrote, "Join to me [sic] to raise the $15,000…" Since DSA had endorsed Jumaane Williams, this money presumably would fund activities supporting Williams' election to NYC Public Advocate in the 2021 race. The DSA-endorsed candidate in the 2021 NYC Public Advocate race was Jumaane Williams.

Duhalde's behavior directly violated The_CFB policies and procedures delineated in the 2019 CFB Employee Handbook, which was in effect at that time. I obtained this Handbook through a FOIL request.

The_CFB is in the business of campaign finance and is fully aware of who makes campaign contributions to City candidates and who acts as intermediaries, fundraisers and boosters. CFB General Counsel, **Bethany Perskie**, who later conducted a review, submitted an affidavit, and provided oral testimony as to her findings, would have easily been able to find this publicly posted information on the NYS Campaign Finance website about campaign contributions to Jumaane Williams from Duhalde's household. The_CFB is in the business of campaign finance and would have access to more resources than I do as an ordinary citizen. Perskie testified under oath— in her capacity as an investigator and as a witness, not as a CFB attorney— that there was nothing suspect or unusual about my exclusion from the voter guide, suggesting these conflicts of interest and constitutional violations are commonplace at the Agency.

In 2021, Jumaane Williams ran against me for NYC Public Advocate. Even though Duhalde has personally contributed to Williams' campaign in the recent past, and even though Duhalde might have helped Williams' obtain the DSA endorsement and the Working Families' endorsements in 2018 and 2019 for his state and city campaigns respectively, and even though Duhalde had recently been fundraising for Williams' political platform, Duhalde came forth unsolicited to "assist" me, the centrist Republican nominee running against Williams in the general election, with my voter guide submission. I wanted to convince voters why they should vote for me over the DSA-endorsed candidate, Jumaane Williams.

The_CFB publishes a voter guide, a resource that provides information about each candidate. There are three forms: a print voter guide (sent through the mail), a web profile voter guide (that appears on The_CFB website), and a web commercial (a video ad of each candidate that appears on The_CFB website, YouTube and other sites). The print voter guide is sent to the household of every eligible voter in New York City.

While this voter guide pertains to elections, it has secondary effects. In my case, it significantly affected my professional reputation as a physician.

Neither Duhalde, nor any other member of The_CFB, disclosed any of his conflicts of interest or his past and present unethical and unprofessional violations of the Employee Code of Conduct. Duhalde did not give me any choice in whether he was assigned to my campaign. I already had another CFB liaison assigned to my case, Kate McGuire. Duhalde simply stepped in out of nowhere.

Then, with the approval of his supervisors, **Hannah Egerton**, the Director of Candidate Services, and **Amy Loprest**, the Executive Director of the CFB, Duhalde deleted my photo, biography, and political platform from the submission. On or about September 2021, The_CFB mailed the voter guide to between 5 and 8 million people with Jumaane Williams' full submission, two other male candidates' full profiles, and an empty white space where my profile should have been.

It also published an online web version that was available nationally and internationally.

By turning a blind eye to Duhalde's relentless campaigning and fundraising for partisan groups while posing as a nonpartisan employee performing governmental functions, The_CFB **failed to enforce its existing policies**. The_CFB **failed to supervise** its wayward employee. The_CFB's true policy was to condone this unprofessional and unethical behavior because of its **deliberate indifference** towards both the candidates and the public. There was no due process regarding Duhalde's quasi-judicial decision to delete me from the voter guide.

In *Monell vs. NYC Dept of Social Services*, the Supreme Court determined that liability was determined not by the scope of the decision, but the scope of the decision-maker's mandate. In this case, the voter guide's layout editor did not make a typographic error and forget to include me in the voter guide. Nor was Duhalde acting in an unauthorized manner. Rather, Egerton and Loprest accepted Duhalde's version of events without giving me an opportunity to be heard. They didn't even inform me of an error until they themselves determined it was too late to correct the error, 8 weeks' later. They **consciously and deliberately enforced an official policy decision** to exclude me from the guide while depriving me of my constitutional right to due process.

Duhalde, Egerton and Loprest also deprived me of my constitutional right to free speech in the voter guide. By law, The_CFB voter guide should have allowed me to speak to voters about my political platform. In my voter guide submission, I talked about fighting corruption. Deleting me from the voter guide was Duhalde's means of hiding this message and censoring me.

Since CFB employees deprived me of two of my constitutional rights with their official policy decision, under Monell, the City of New York is liable.

## 2. *Titles Are CRITICAL to The_CFB*

Chapter 16 of the New York City Charter legislates that the Campaign Finance Board publish a voter guide. The voter guide must include the candidates' current occupation and employer, prior employment, past public service, educational background, organizational affiliations, principles and platform. David Duhalde had knowledge of this law and cited it in a 9/20/21 email to me.

The_CFB set 8/2/21 as the deadline for candidate submissions to the voter guide for the general election. It stated it would only accept submissions through the web portal. On 8/2/21, the website crashed making it impossible for anyone to submit information on that date through the portal. After several hours of futile attempts, I emailed The_CFB my candidate submission as Word documents and screenshots. I referenced the hours I had spent in an email to them. The_CFB declined to accept the submission in this format and demanded submission through the defective portal.

Ultimately, The_CFB extended the deadline, but its site remained non-functional. The_CFB granted itself another extension and set a third deadline of 8/3/21. I submitted my information through the web portal on this date.

On 8/4/21, I received confirmation that The_CFB had received my voter guide submission. Duhalde, who I had never encountered before, emailed me and cited "Board Rule 16-02(b)(i)(D)(1)." He said I could not refer to my opponent in the 2021 Public Advocate race, Jumaane Williams, a public official and the incumbent, by name. Duhalde wrote, "You would be allowed to say terms such as 'current Public Advocate.'"

I revised my statement at that time. Because The_CFB had emphasized for days that it would only accept submissions through the web portal, I submitted the revised profile through its web portal on 8/5/21. The web portal stated clearly that it was still accepting submissions through 8/5/21. I took a screenshot of this message on 5/24/23 since the portal for the 2021 elections is still visible. I was not able to submit the video voter guide script through the web portal on 8/5/21 so I emailed Duhalde the script and referenced the technical issue with the web portal for the video voter guide. I did not reference the revisions that went through successfully— only the revisions that I had trouble with. I did not hear anything back from Duhalde.

Over the next eight (8) weeks, just a couple months before the general election, my campaign Treasurer (Mary Nampiaparampil), my husband (Hormis Thaliath, a former CFB employee who worked alongside Loprest, Egerton and Perskie), and I had multiple points of contact with CFB employees: over email, text, over the phone, through virtual meetings, and face-to-face at a wedding of a former CFB employee. No one mentioned any potential problem with my voter guide submission to either of us for the next eight weeks.

After I emailed Duhalde on 8/4/21, Duhalde deleted my voter guide submission in its entirety. He did not tell me. No one else at The_CFB informed me for eight weeks. Therefore, I did not have the opportunity to correct any potential "errors."

Even though The_CFB had missed multiple deadlines that it had set for itself with respect to the voter guide submission, The_CFB emailed me that because I had "missed" a deadline, I was completely excluded from both the print and online voter guides. I disputed this over email to no avail. Then on 9/29/21, I filed for a temporary restraining order on the voter guide requesting that a flier or postcard insert be added to the mailer with my information. Without ever speaking to me or hearing my side of the story, The_CFB refused and mailed out its voter guide to between 5 and 8 million people. The real impact was far greater because many of these individuals live and work in different counties and speak to people in other states and countries. I did not personally see the voter guide until 10/21/21, the night before the injunction hearing.

In their 2016 paper, "Empowering Small Donors," CFB General Counsel Perskie and CFB Executive Director Loprest quoted the Supreme Court and wrote, "The First Amendment affords the broadest protection to... political expression in order 'to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Nevertheless, these actors did not

hesitate to quash my political expression in The_CFB's voter guide is required by law to inform voters about their candidates for public office. There was no due process.

Duhalde and The_CFB excluded my photo, candidate statement, political platform and plans for the city from the taxpayer-funded nonpartisan voter guide citing only one reason. Duhalde said that I had referred to the incumbent by his given name, Jumaane Williams, rather than by his title, the Public Advocate, and used this as the means to prevent me from communicating my ideas to the public.

There is no legitimate public interest between referring to an opponent by his name or by his title. In fact, referring to an opponent by his title prejudices the public because it reminds voters the other person is in a position of power as the incumbent. This creates a bias. I agreed to revise my voter guide submission but The_CFB still denied me access to the voter guide. This is because there was no legitimate public interest in referring to my opponent by his title rather than by his name. This was simply a pretext to restrict my free speech and deny me access to the voter guide.

Because these were official policy decisions, and they were conscious and deliberate actions by CFB decision-makers, under Monell, the City of New York is liable for the actions of its employees.

### 2. *Similarly Situated Physicians Running For Office in New York City*

In the past five years, four physicians who live in New York City have run for office:

1. Dr. Jeffrey Ascherman is a plastic surgeon who performs reconstructive surgery and other procedures for patients with cancer, severe burns, wounds, and other deformities

2. Dr. Raja Flores is a thoracic surgeon who evaluates patients and performs surgery and other procedures for lung cancer, mesotheliomas, and other diseases of the chest wall.

3. Dr. Awadhesh Gupta is an internist who came out of retirement in early 2020 to risk his own life by volunteering at City MD Urgent Care testing and treating those with COVID

4. Dr. Devi Nampiaparampil. I am a pain physician performing minimally invasive spine and other procedures for those with cancer, neurologic, musculoskeletal, and autoimmune disorders; I worked throughout the pandemic to keep people out of the Emergency Rooms and hospitals

In Sanskrit and Hindi, "Raja" can mean King or Hope. "Awadhesh" is the King of Ayodhya, the Unconquerable City. "Devi" is the Goddess who saves the world from Ignorance. For the latter three of us, our names are easily identified as being of "Indian" origin. All four of us physicians are minorities in one form or another although we are often misclassified. I am Christian although I am often mistaken for Hindu. Dr. Ascherman is Jewish although he can be mistaken for an Anglo-Saxon white male. In this complaint, I will refer to how people are often categorized by the public.

In 2018, The_CFB published a voter guide identifying an ostensibly white male, Dr. Jeff Ascherman, as a physician by using "Dr." before his name.

However, in 2021-2022, during concurrent COVID, mental health, and opioid crises, three ostensibly East-Indian/ Asian-American Hindu physicians ran for office in New York City. The_CFB published all our names in its voter guides and press releases without the "Dr." title identifying us as physicians.

Immediately prior to my run for office, healthcare workers– especially doctors– were held in high esteem by the public. Every night at 7pm, people would clap and cheer for healthcare workers risking their lives and their loved ones' lives to protect the public. By depriving us of the "Dr." title, The_CFB deprived three of us physicians– who had *all* served the public during the early and worst days of COVID– of the goodwill that we had rightfully earned with our service and sacrifices.

Dr. Ascherman, Dr. Gupta and I are members of the same political party. Dr. Flores is not, so The_CFB's decision to exclude the "Dr." identifier was not based on political membership.

Dr. Ascherman called me at my office in July 2021, during my Public Advocate race, and said he used the "Dr." title in his earlier race. After speaking to him, I effectively argued *pro se* in front of the Board of Commissioners at the Board of Elections (BOE) to publish my name on the ballot as "Dr. Devi Elizabeth Nampiaparampil." That was the earliest time I could be placed on the calendar after the petitioning period itself.

David Duhalde, an ostensibly white male, was aware of the pending mismatch between its voter guide and the ballot. On September 20, 2021, Under color of law, Duhalde emailed me, "Your name will appear as Devi Nampiaparampil in the print version of the Voter guide. *It would be against current CFB policy to ever* included [sic] 'Dr.' regardless of the name filed with BOE."

When I responded by email on the same date, "It seems like it would be very confusing to voters if the voter guide, which is supposed to assist voters, listed my name very differently than the actual ballot. "Dr." Is missing and "Elizabeth" is missing. Can you send me the exact reference for the law, protocol, or policy where this paragraph (below) comes from?"

Under color of law, Duhalde responded, "*This is a long-standing policy that has been in existence since late last century.* The campaign chose to list the candidate in the voter guide as Devi Elizabeth Nampiaparampil when it made its submission to The_CFB on August 3, 2021."

Duhalde focused only on The_CFB's web portal, which its own employees had programmed to block honorifics. Because The_CFB's own employees programmed the portal this way, there was no way I could have added the "Dr." title to the web portal. This shows this was the custom and practice of The_CFB. This portal contained only fill-in-the-blanks with first, middle and last name slots. The_CFB repeatedly stated it would only accept web portal submissions.

Nevertheless, I simultaneously emailed The VGSA Voter Guide Submission email address a Word document submission including my name with the "Dr." title before the deadline.

I formally asked The_CFB to identify me as "Dr. Devi Elizabeth Nampiaparampil" in its voter guides during virtual meetings with my 2nd assigned campaign liaison, Kate McGuire, (4/21/21 and 5/18/21) and with my 3rd assigned campaign liaison, Jaclyn Williams, (9/15/21), through emails to its employees, my 1st assigned campaign liaison Honda Wang, (8/2/21), Kate McGuire (8/2/21), "VGSA" (8/2/21), text messages to Dru Gibson (8/17/21 and 9/16/21), and in a handwritten message on my video voter guide film release/ consent form (8/17/21). I referenced The_CFB's disparate treatment between me and Dr. Ascherman in multiple communications with CFB employees.

Ignoring the dates on these communications, Duhalde replied under color of law, "Board Rule 16-02(b)(i)(F) states that candidates must submit their information for the voter guide by the deadline set by the Board. The deadline for submission was August 3, 2021. The campaign submitted its information, including the candidate name, on August 3, 2021. The campaign notified us that it wanted to change the name associated with the statement on DATE. Unfortunately, the request for a change is 45 days past the deadline."

Duhalde generically wrote "DATE" in his email because he did not review the actual dates of my numerous requests. The actual dates of my numerous requests were well before the "deadline." Duhalde was indifferent to the actual dates. The missed deadline was a pretext for discriminatory treatment based on race and sex on top of his bias to help his chosen candidate.

Even if The_CFB employees had missed my requests by accident, Duhalde still purposely denied my constitutional rights since the Agency had clearly allowed one of my white male volunteers, Dr. Jeff Ascherman, to use the "Dr." title in his race.

I think it would have taken me a couple minutes max to type "Dr." in front of my name. In her affirmation dated 10/20/21, The_CFB General Counsel, also ostensibly white, Bethany Perskie affirmed under oath that even typing one word in the voter guide might equate to between 1 and 7 days' worth of work for her city government Agency. But she did not suggest that typing the word "Dr." in front of my name would require forty-five (45) days' worth of work (or notice) as Duhalde, an ostensibly white male, demanded.

When I emailed Duhalde, CFB General Counsel Bethany Perskie responded, "*Please be advised that we will not be responding to inquiries* related to the subject of pending litigation." Since Dr. Ascherman could not have added his name to his submission through the portal which blocked honorifics, and since Dr. Ascherman had no bio included in his voter guide because he apparently did not meet the deadline either, a CFB employee independently added the "Dr." title to his name. No one at The_CFB could tell me what qualified him to be identified to the community as a "Dr." as opposed to any of the East-Indian/ Asian-American candidates.

Over the course of his emails, Duhalde changed the reason for his denial. He initially said honorifics were illegal perhaps to delay or dissuade me from even making the request. Then he told me I missed the deadline to make the request.

**Hannah Egerton,** the Director of Candidate Services for The_CFB, ostensibly white, responded on behalf of **Amy Loprest,** the ostensibly white CFB Executive Director. Both were fully aware of the disparity between how I was being treated and how Dr. Ascherman had been treated. Egerton replied directly to my email about Dr. Ascherman's use of the "Dr." title. Egerton wrote, "*It is our long-standing policy* that honorifics such as 'Dr.' are not included as part of the candidate's name. *We hold all candidates to the same standards and cannot make any exceptions."*

18

In October 2021, in the critical time period before the November 2, 2021 general election, Duhalde, who was concurrently online campaigning and fundraising for the DSA "hid" the video voter guide submission of Mark Szuszkiewicz, an ostensibly white male Republican City Council candidate who he was working with as part of his official CFB governmental job functions. Instead, Duhalde posted an outdated link to video submissions submitted by candidates from the June 2021 Democratic primary election. Szuszkiewicz emailed Duhalde and pointed out that only his Democratic opponent's video was visible to the public— and not his own. Duhalde deferentially raced to correct the issue for Szuszkiewicz.

When questioned by a white man, Duhalde meekly acquiesced, performed his job, and immediately offered an explanation (albeit false according to Szuszkiewicz) for the error. When questioned by a non-white female (me), he escalated his discriminatory behavior and took retaliatory action using the government's power. Duhalde emailed me I would not be able to use my middle name "Elizabeth" in the voter guide, thereby de-identifying me both as a physician and as a woman. Since most of my supporters recognized me more as a female physician rather than by my last name [Nampiaparampil], which I rarely used and which hardly anyone could spell out, if The_CFB de-identified me as a woman, it would be a serious threat to my candidacy. Voters would not have been able to identify me among the candidate names.

This is evidenced by other CFB employees, including Dru Gibson, the video producer who filmed my CFB commercial, the "video voter guide." Despite The_CFB's emphasis in every single one of its emails and all of its formal board hearings and virtual events about the importance of using the correct gender pronouns, after reviewing my video voter guide submission, Gibson misgendered me and texted me as "Mr. Nampiaparampil."

Since I had no idea what the voter guide layout looked like for the print, online or video versions, I couldn't tell if they had added "Mr." in front of my name. Even though I am a woman, it was so implausible to this CFB employee that I could be a physician, a scientist, a candidate for citywide office, and a woman, that she assumed I must be a man. Therefore, she wrote to me referring to me as "Mr." I was extremely concerned that Duhalde, Egerton and Loprest would remove the "Elizabeth" from my name, attempt to misgender me in the voter guide itself, and confuse my base of supporters as well as general voters.

Both Dr. Ascherman and I are physicians from the same political party, who both studied and trained at Harvard and Columbia, with faculty appointments at university medical centers. Other doctors voted both of us to the Castle Connolly list of top physicians in the country. We are each parents living and working in Manhattan as small business owners. We are similarly situated except for race and sex.

The_CFB was aware its actions would confuse voters rather than "inform" them both in the mismatch between my voter guide and ballot names and in the disparate treatment. Under strict scrutiny, The_CFB had no compelling reason to diverge from the Board of Elections' decision.

Nor does the government have a compelling interest in denying me and other ostensibly East-Indian/ Asian-American physicians use of the "Dr." honorific while simultaneously granting ostensibly white men such as Dr. Ascherman use of the same title. The NYC Charter places the burden on The_CFB to inform the voters through the voter guide. It does not place the burden on the candidates. To facilitate this, taxpayer money and resources are given to The_CFB– not to candidates. This is one reason why candidates depend on The_CFB.

As Duhalde and Egerton asserted in their multiple emails, their behavior was consistent with the pattern and practice in place over the course of years. All the East-Indian/ Asian-American doctors were routinely denied the use of their honorific titles, the acknowledgement of their service. This was a denial of due process for physicians risking their lives and their families' lives– serving during a global pandemic prior to the development of effective treatments and vaccines– while others, including CFB employees, stayed at home.

Why are East-Indian/ Asian-Americans like me risking our lives for a city that would treat us like second-class citizens? Because Duhalde and Egerton applied their unspoken "rule" only to the East-Indian/ Asian-Americans, they used their governmental authority to punish the non-white candidates.

Based on Monell vs. NYC Dept. of Social Services, The_CFB and the City of New York can be held liable for Duhalde and Egerton's actions because, in multiple emails on multiple dates, they cited their "current" and "long-standing" policies that have been "in existence since late last century." Although there is no traceable policy that Duhalde, Egerton or The_CFB's FOIL Officer have been able to produce since my initial email request in August 2021, and although The_CFB applied their unconstitutional fake policy in a discriminatory manner based on the candidate's race (white vs. Asian-American), the Supreme Court still held that if government employees have fallen into a custom or practice of committing constitutional violations, condoned by the entity, as these individuals did, then there is municipal liability attached. This was not a single act. This custom was "long-standing" as Duhalde, Egerton and Loprest (The_CFB Executive Director) asserted. The custom affected multiple physicians over the course of several years.

Because Dr. Ascherman and I were members of the same political party and appealing to the same campaign donors, because I said I was responsible for over 3500 patients during COVID, the presence of the "Dr." title next to his name and the absence of the title next to mine, made it appear as though I had lied about being a physician and lied about my service during the pandemic. People thought I was a fraud. People thought I had lied to steal their money in the form of campaign contributions. These would-be supporters wanted revenge. Government employees aimed to destroy my reputation and my career without any due process.

#### 4. A Badge of Infamy

The_CFB's 2021 voter guide highlighted "Devi Elizabeth Nampiaparampil" with a bright orange symbol and then falsely wrote, "Candidate did not submit a complete profile in time for inclusion in this printed Voter Guide."

In Wisconsin vs. Constantineau (1971), the Supreme Court dealt with this issue where a government employee posted a sign on a liquor store explaining why a presumed alcoholic was denied the ability to purchase alcohol. The truth of the matter– whether he drank too much– did not enter the decision-making. Justice Douglas wrote the majority opinion, "It would be naive not to recognize that such 'posting' or characterization of an individual will expose him to public embarrassment and ridicule, and it is our opinion that procedural due process requires that, before one acting pursuant to State statute can make such a quasi-judicial determination, the individual involved must be given notice of the intent to post and an opportunity to be heard on the matter... Where the State attached a 'badge of infamy' to the citizen, due process comes into play... 'The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' Anti-Fascist Committee v McGrath... Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential"

In this case, The_CFB gave me absolutely no notice of any issue with the voter guide. I had no opportunity to be heard. I had not even seen the voter guide until the night before the hearing that I had requested– an injunction that I had wanted for a different reason. By the time I saw the voter guide, and by the time of the hearing, it had already been mailed to between 5 and 8 million people. Even during the hearing, I couldn't be "heard." I was placed on mute for the entire proceeding. I kept texting my

attorney but he didn't look at his cell phone. I raised my hand several times but my attorney did not acknowledge me and the Judge told me I could not speak. Either way, the voter guide had already been widely distributed. The online voter guide was visible nationally and internationally. I had an international audience because I was receiving news coverage in India, the United Kingdom, the Middle East, countries that were formerly known as the Soviet Union, and other parts of Asia.

Duhalde and Egerton intended to deprive me of my good name and reputation and to stigmatize me with this badge of infamy. The_CFB had time and resources to type out this 16-word damaging sentence to the voter guide but had claimed it did not have the time and resources to add the 1 word "Dr." to my name or to delete the 2 words "Jumaane Williams" from my submission. It needed a 45-day window to accomplish those tasks– even though it had had more than 45 days' notice to do so. CFB General Counsel Perskie testified– as a witness– that it was too much work for her Agency to delete the 2-words "Jumaane Williams" from my submission. If The_CFB had just deleted his name, it could have included the rest of my profile, platform, and biography in its guide.

The issue with "Jumaane Williams" name was simply a pretext to bypass due process and restrict my free speech. These individuals did not uniformly care about titles. That is why they were so quick to disregard my "Dr." title.

This CFB statement, published by The_CFB, made me appear careless, uninterested, incapable and fraudulent. I am a physician who performs minimally invasive spine procedures, where even a millimeter can mean the difference between a successful surgical procedure and a stroke, spinal cord injury or death. To be portrayed in this manner immediately harmed my reputation personally and professionally. People thought I was careless because I was running with the intention of losing. They inferred that could only be because I was actually money laundering, stealing from people or trying to block a legitimate candidate from winning the election.

The CFB testified that the voter guide printing alone cost $1.5 million in direct advertising costs. It cost me that amount of direct advertising. CFB General Counsel also testified that the CFB also provided indirect benefits in terms of staffing and other resources for the mailing.

Given the nature of its work, the CFB would have been familiar with the *Cynthia Nixon vs. Andrew Cuomo* situation where a mass mailing sent by a third party immediately before their primary election created the perception that Nixon was anti-Semitic. That perception cost her the election and harmed her personally and professionally. CFB employees did the same thing to me.

## 5. *Similarly Situated 2021 Public Advocate Candidates*

Under the direction of an attorney I had hired to represent me in the matter, I filed a temporary restraining order on the voter guide. I understood immediately how much damage my deletion could do to my professional reputation. I was not aware of the badge of infamy at that time. Before the hearing could take place, The_CFB mailed this voter guide to the household of every eligible voter in NYC before the hearing date– including the Supreme Court Justice presiding over the injunction hearing. CFB General Counsel, Bethany Perskie, did not disclose this unethical and prejudicial ex parte communication to me or we would have requested a change in venue. The Judge disclosed it and he clearly stated that it influenced his decision, as evidenced by the hearing transcript.

Duhalde did not testify; nor did he submit an affidavit. CFB General Counsel Perskie testified as a witness, and simultaneously argued the case as an attorney. She also submitted an affidavit "upon [her] information and belief," which was limited since she had no direct knowledge of the events. I had no opportunity for cross-examination or to present rebuttal evidence to her oral testimony.

I had submitted my revisions to the voter guide submission through The_CFB's portal. The_CFB stated it had not received the changes. No one ever informed me of this. During the hearing, Perskie testified as a witness and introduced a new fact that the Agency had closed the portal on its end– even though it was still open on the candidates' end– suggesting this is why The_CFB did not receive the revisions. It never checked for any revisions.

During the hearing, the Agency essentially argued the portal issue was irrelevant because Duhalde's instructions were "clear" in that I should have *emailed* my substitution of the term "Public Advocate" for "Jumaane Williams." Duhalde's actual email said, "Please feel free to email changes," in a relatively casual tone.

In part because the voter guide had already been distributed to *millions* of households, the Judge dismissed the restraining order request as "moot" and "futile." Because I had not made any other written requests other than the restraining order, there was no opportunity for other relief.

23

After the hearing, Theo Chino, a DSA lifetime member and another one of my male opponents in the same 2021 Public Advocate race– a similarly situated candidate except for sex– submitted an affidavit to the Judge on my behalf describing how we had received disparate treatment. He told me he had also used "non-compliant" language, including Jumaane Williams' name, in his voter guide submission. A CFB attorney, Kathleen Loving, called him to notify him. The_CFB attorney co-authored his submission and made changes for him. Then The_CFB attorney emailed him the changes and called him again to make sure that the changes were acceptable to him. The_CFB ensured Chino would be included in the voter guide.

I emailed Theo Chino's affidavit to Perskie, Egerton and Loprest and asked to be included in the *online* voter guide, which was simply a website. I argued why it would be in the public interest, which The_CFB was legislated to represent based on NYC Charter Chapter 46, §1053. The_CFB ignored my multiple requests, made after the hearing, to have my background and platform shared with the voting public.

Shortly before she left her position with The_CFB, my third assigned liaison Jaclyn Williams, told me in a virtual meeting on 1/14/22 that she was not aware of my exclusion from the voter guide until after I found out myself. Her supervisor was not aware either. Had they known, they could have informed me of a problem that could be corrected. Also, she agreed Duhalde was never assigned to my campaign as my liaison. Kate McGuire was my assigned liaison, but Duhalde bypassed her– simply to delete me as though that was his sole intention. Jaclyn Williams stated Duhalde and Egerton made the decision to delete me together. They deliberately chose not to inform me until after the guide was sent to the printer. I recorded the 1/14/22 virtual meeting since New York is a one-party recording state and Williams verified she was working from home at the time. CFB employees are supposed to live in NYC.

On 1/14/22, Jaclyn Williams emailed me, "You had asked… whether David Duhalde was solely responsible for the review and exclusion of your Voter Guide profile. I confirmed with you that the Voter Guide deadline was 8/3/21, at which point Kate McGuire was still assigned as the campaign's liaison; I was assigned to your campaign on 9/3/21… If you have any additional questions about the Voter Guide, please feel free to contact the Director of Candidate Services, Hannah Egerton directly."

*Explanation:*

The government's primary objective was to prevent the transmission of my ideas to the public. If The_CFB's objective was to remove "Jumaane Williams" name from my submission, it could have

removed the non-compliant sentences. It had done this for another similarly situated citywide candidate, Sean Hayes. Hayes, an ostensibly white male, ran for Mayor in the same year, 2021. The_CFB had published a full profile for him and left a blank section where there was "non-compliant" language.

The_CFB also could have contacted me and rewritten the statements for me, as it had with my opponent, Theo Chino, a similarly situated male candidate who ran in the same 2021 Public Advocate race as me. Instead, both male candidates were given full profiles in the 2021 print and online voter guides.

To facilitate this content-based restriction in freedom of speech, The_CFB deleted my photo, background and statements, stripped me of my "Dr." title, and mailed a hard copy of this document affixing my name with a badge of infamy to between 5 and 8 million households. By omitting me, The_CFB planned to discredit me, my ideas, and my statements in the eyes of the public and fundamentally restrict my political expression.

Duhalde had emailed me that I could use the term "Public Advocate" but I could not use the name "Jumaane Williams" as I had done. If I had made a defamatory statement, then The_CFB would have required that I remove the entire statement. It would not have been acceptable to substitute "Public Advocate" for "Jumaane Williams" because both terms identified the same person. Either version of the sentence would have been defamatory. In this case, the sentence was not defamatory. The_CFB discarded my "Dr." title because it had no respect for me, but it simultaneously demanded I address my opponent by a more respectful title than his name. **The issue of non-compliance regarding the substitution of names was simply a pretext for depriving me of my constitutional rights.**

This fundamental restriction of my protected speech, this pretext for restricting my political expression and this disparate treatment based on race and sex was in violation of my 42 U.S.C. Section 1983 first and fourteenth amendment rights to freedom of speech, equal protection under the law and due process.

Under strict scrutiny, there is no rational relationship to a legitimate public interest for public employees to publish and occasionally co-author the Public Advocate candidate profiles of all the candidates who are not East-Indian/ Asian-American while refusing to publish and refusing to edit the profile of the Public Advocate candidate who is East-Indian/ Asian-American.

Under intermediate scrutiny, there is no rational relationship to a legitimate public interest in having all the male Public Advocate candidates' submissions published but denying the female candidate's submission to be published.

There is no rational relationship to a legitimate public interest for using an elected official's title over his name in voter guide materials.

There is no rational relationship to a legitimate public interest for communicating for submitting revisions over email rather than a web portal based on a government employee's caprice, especially when the web portal states it is actively accepting submissions.

There is no rational relationship to a legitimate public interest in having a candidate type out the words "Public Advocate" for "Jumaane Williams" rather than having a government employee type out those same words.

The public interest would have been better served if I had communicated my platform to NYC voters—as required by the NYC Charter Chapter 46, §1053.

---

**ACT THREE: Date of Occurrence: October 20, 2021**

> **Date of Discovery:   October 21, 2021 (Date I Read Campaign Finance Board Voter**
>
> **Guide)**
>
> **Place of Occurrence: Everywhere (Online)**

**\*Date of Discovery is the same as the Date of Discovery for the Print Voter Guide**

I am repeating all of the facts that I stated above.

The_CFB consciously and deliberately published an online voter guide press release reiterating its previously made false statements. This was published after I had filed for a temporary restraining order

on the voter guide— but before we could be heard on the matter. The_CFB press release was a newly placed and published "badge of infamy" depriving me of my constitutional right to due process and restricting my protected free speech. It damaged my professional name and business, Metropolis Pain Medicine d.b.a. Devi Nampiaparampil, M.D., damaged my credibility, and harmed me and my family personally. Then secondarily, the CFB harmed my employees, my 3500+ patients because we were delayed in obtaining COVID relief funds, for example, and potentially harmed the cases I was working on as an expert witness by damaging my credibility. Ironically, I have worked as an expert witness for the City of New York itself.

Again, under *Monell vs. NYC Dept of Social Services*, because Duhalde, Egerton and Loprest were enforcing an official policy of The_CFB depriving me of my constitutional rights, and because The_CFB published the press release as a result of their conscious and deliberate actions in furtherance of that unconstitutional policy, the City of New York is liable for their actions.

---

**ACT FOUR:**    **Date of Occurrence: October 22, 2021**

                     **Date of Discovery: January 3, 2023 (Date I received the Hearing Transcript)**

                     **Place of Occurrence: New York County**

**FACTS:**

On 9/29/21, I filed a temporary restraining order on the print voter guide. The_CFB was appropriately served by email during the COVID pandemic. Hannah Egerton accepted email service. Before the hearing date, The_CFB mailed the voter guide to the home address of the Judge rendering a decision on the case. During the hearing, the Judge referenced this. On page 16 of the certified hearing transcript, the Judge stated, "I thought we were talking about the profile that went out to— the written profile that was mailed to voters; and as a matter of fact, I received one myself."

I was not aware that the Judge, Shlomo Hagler, had received the voter guide until the hearing itself. The premise of the injunction hearing was to stop people from having a negative impression of me after reading it. The Judge did not allow me to speak during the hearing so I could not address this. My

attorney, David M. Fish, did not object to this one-sided communication that occurred before the hearing.

During the hearing, the Judge implied his decision about issuing a restraining order was influenced by the voter guide he received. He said, "I'm not sure what your client wants me to do... the voter guide has gone out. We know that because I've received one; you probably have received one... Quite frankly, it's moot. The voter guide has been distributed and mailed citywide to millions of people. To take that back is a virtual impossibility." The Judge ruled in favor of The_CFB.

## Lack of Due Process #1: Prejudicial Ex Parte Communication:

At the time The_CFB mailed its voter guide to Justice Shlomo Hagler, Egerton and CFB General Counsel Perskie were aware that I had filed for a temporary restraining order on the voter guide because of the voter guide's prejudicial effects. Perskie willfully chose **not** to wait for the outcome of the hearing before mailing out the guide. The_CFB willfully chose not to screen its mailing lists or to exclude the mailing addresses of Supreme Court Justices. As CFB Counsel, Perskie and Tim Jutte, who appeared together at the hearing, would have been aware that this mailing to the Judge's home constituted an *ex parte* communication about me prior to the official hearing. They were aware that I would not be able to address the voter guide with the Judge when he received it in the mail at home. They were aware that I could have requested a change in venue if I had known that they had sent this prejudicial mailer about me directly to the home addresses of all the Judges in New York City. Since every Judge had been elected to office, these Judges would have been more likely than the general public to review and pay attention to the voter guide.

## Lack of Due Process #2

### Background:

CFB General Counsel Perskie acted as an attorney, investigator and witness during the injunction hearing on the voter guide. She was the CFB's only witness at the hearing. She testified at the hearing that the CFB had never received any revisions from me for the print and online voter guide, which is why The_CFB had allegedly excluded me from both.

On page 11 line 7, Justice Hagler stated, "I've read the opposition. I need to clarify a point because this is very important... The affirmation of the general counsel, Bethany Perskie, does not mention that there was a submission after the request on August 5th [sic]." (I believe this should read "after the request for revisions by August 5th)."

Although I had described these facts in detail in an email to my attorney on 10/21/21, and my attorney David M. Fish could have referenced that email, he responded on page 11 line 17, "I can't testify as a witness. The plaintiff is present on this call." Justice Hagler replied to that, "No, no, no, I'm not asking you to be a witness. Obviously, you're prohibited from being a witness in this matter if you're going to represent the plaintiff in this case..." The Judge barred my attorney from testifying. The Judge also prohibited me from testifying during the hearing. I was kept on mute during the entire virtual hearing.

CFB General Counsel, on the other hand, testified to a new fact. For the first time, she informed us that The_CFB had closed its web portal to receiving submissions before the August 5, 2021 deadline– but only on its receiving end, not on the submitting end. That meant that even if I had submitted my revisions through the portal– which I did– CFB employees would not have automatically received the revisions. This was a material fact that was left out of Bethany Perskie's Affirmation and introduced solely during the hearing when she testified as a witness.

Her testimony suggested that no one had actually checked the web portal for my revisions. Perskie repeatedly testified that CFB employees had not *received* my revisions but she would not testify that anyone had actually even checked the web portal for my revisions.

The_CFB General Counsel, Perskie, was also allowed to introduce her own hearsay testimony about other anonymous people's impressions of my behavior. The_CFB General Counsel began her hearsay testimony about anonymous witnesses on page 20 line 16, "From the perspective of [the] staff..." which then continued on page 21 line 11, "It was the staff's impression..." In both cases, their "impressions" of me were negative and damaging to my career, reputation, and run for office. There is no reference to who these anonymous staff members are in either the oral testimony or the written testimony by The_CFB Counsel.

While it is possible that Perskie kept them anonymous because they were fictional characters, it is more likely that Perskie kept their names hidden because at least one of them was Duhalde. She consciously and deliberately chose not to disclose Duhalde's name so as not to be asked about his past campaign contribution to my opponent's campaign, "Jumaane For New York," or fundraisers for the DSA, which was financially subsidizing my opponent in the race. As General Counsel specializing in campaign finance law, Perskie would have and should have been fully aware of this major conflict of interest and necessary financial disclosure.

On page 20 line 7, CFB General Counsel stated, "We never received any statement for the print... guide... I will say that in Exhibit F in the e-mail that was referenced earlier, plaintiff did say that she tried to upload to the portal." The email referenced in Exhibit F was dated 8/5/21, which would have made the statement for the print guide timely.

Immediately afterwards, CFB General Counsel also referred to me (the Plaintiff) and asserted the opposite, "There was no reference of any attempt to submit a print statement by e-mail or by the portal or otherwise..."

Because CFB General Counsel made back-to-back contradictory statements, Justice Hagler responded on page 21 line 2, "Can I ask you to clarify?" to which Perskie answered with a statement directly contradicted by the email in Exhibit F that she had already referenced herself. She testified as a witness, "It was the staff's impression that that was the entirety of the submission because there was no reference to any other submission that was attempted to be made."

The_CFB General Counsel did not produce any affidavits from "the staff" as to their impressions. She did not produce any staff for oral testimony. She simply testified on her own as a witness and investigator introducing this new fact.

Although my attorney did not ask to cross-examine her as a witness, she did testify as to new facts. And I could not even communicate with my attorney, about that, or about these anonymous witnesses to ask him to object because I was on mute.

*Argument:*

I have designed web portals for the Department of Veterans Affairs multiple times in the past. Ever since I started running for office, I have been mistaken for working in Information Technology (IT) myself. When creating a web portal, one task is to create the portal itself using code. Another task is to create the content for the portal– perhaps in Microsoft Word. Someone has to write the text that appears to the user. In the web portal, there is text that appears and states that the Due Date for the submission was 8/5/2021. The person who wrote that text may have been the same person who created the portal or it might have been someone different.

30

CFB General Counsel Perskie was hired as a government employee and lawyer to represent the public– not to represent Duhalde and Egerton as their personal attorney. One could argue it was in the public interest either to get to the truth of the matter or to inform the public on the platforms of all the candidates (regardless of the truth). There was no legitimate public interest in both hiding the truth and hiding information about the platform of one of the major party candidates for citywide office.

When acting as an investigator rather than as an attorney, CFB General Counsel Perskie willfully chose not to obtain testimony from the web portal creator or from the web portal content creator or from the person who was assigned to check for submissions through the web portal. Any of them might have been able to support my version of events. In her affidavit dated 10/20/21, CFB Counsel willfully chose not to provide the names or titles or job functions of any of the people she interviewed in her investigation.

Instead, CFB General Counsel deliberately chose to act as the sole witness for The_CFB testifying to matters of which she had no direct knowledge of. That way, perhaps Counsel planned to claim ignorance and/ or zealous representation and gain immunity. But this is a faulty argument because this was willful ignorance and because she was not acting as an attorney throughout. She also served as an investigator and as a witness.

Although my attorney David M. Fish did not cross-examine her on her testimony, and he did not ask for a return date on the CFB's Cross-Motion, Memorandum of Law, and Affirmation, CFB General Counsel was aware that there are standard time frames. When I filed a case pro se, she referenced a civil procedure where all my paperwork had to be returned to her at least 7 days before the expected date. Yet, she gave us her paperwork for the injunction hearing less than 36 hours before the hearing. This gave me very little time to investigate any of her claims as a witness testifying to events that she had no direct knowledge of.

Throughout the hearing, there was a false comparison made between my credibility and Perskie's credibility. She substituted her reputation and credibility for Duhalde's, perhaps to shield him from having to answer questions about his relentless campaigning and fundraising for the opposing party while contemporaneously excluding me from the nonpartisan voter guide. There were other missing and anonymous witnesses– again the web portal creator, web portal content creator, and web portal content receiver– as I have referred to above.

At the time of the hearing, as a licensed attorney in the State of New York, Perskie would have been aware of American Bar Association Rule 3.7 and its New York State cohort, which opposes witnesses simultaneously acting as attorneys because of the prejudicial effects on the opposing side.

*Lack of Due Process #3:*

*Background:*

CFB Counsel testified on page 21 line 6, "The_CFB did not receive anything through the portal because at that point the portal was unable to receive submissions." This was another new fact introduced at the hearing.

On page 14 line 17, my attorney asserted, "There clearly are facts in dispute... This is a fact in dispute." Justice Hagler also stated, "Quite frankly, it contradicts again the affirmation of the general counsel."

This deception led Justice Hagler to a false conclusion on a material fact. On page 21 line 16, the Judge asked, At any point in time did the defendant New York City Campaign Finance Board *receive* the revisions requested by the Board, whether timely or untimely...?" to which The_CFB Counsel responded, "No, they did not," and the Judge continued, "...[Nampiaparampil] states that it was done... I asked [The_CFB General Counsel] two different ways to make sure that we had a clear recitation of the facts... Both in papers as well as documentary evidence submitted to the Court, provide that [Nampiaparampil] did not *submit*... the revisions..."

*Argument:*

I had submitted my revisions through the portal before The_CFB's August 5, 2021 deadline and was not aware that anyone had closed the portal on The_CFB's receiving end. Even today on May 25, 2023, almost 22 months after the deadline, I am still able to revise my candidate profile for the voter guide in The_CFB web portal because no one at the CFB has taken down the web portal for the 2021 voter guide.

If The_CFB truly wanted to stop candidates from submitting their profiles through the portal, it could have deactivated the portal screen on the candidates' submission end. It only closed the portal on its receiving end creating confusion. If Atlanta wanted to stop incoming planes departing from New York City, the planes would be grounded in NYC. Atlanta Hartsfield-Jackson wouldn't give them the green

light to take off, block them mid-flight, and then argue that the planes never took off in the first place. That is what The_CFB did to me.

Justice Hagler equated my submitting the revisions with The_CFB receiving the revisions. The_CFB chose not to bring any witnesses with a formal background in Computer Science to the hearing and the Judge would not allow me to speak even after The_CFB introduced this new material fact. IT could have explained how a profile could have been submitted but not received. The_CFB chose not to produce any affidavits from IT or from employees knowledgeable about its web portal. Instead, The_CFB General Counsel testified as its sole witness and remained silent at a critical juncture, showing this was willful ignorance about not receiving my submission through the web portal, a fraudulent misrepresentation of the facts rather than a misunderstanding.

Even the premise that I didn't submit the revisions didn't make sense. If I had already dedicated hours writing up a voter guide submission myself, and then spent several hours over the course of multiple days trying to overcome the technical problems that the CFB had already acknowledged it had experienced with its web portal, why would I stop short of changing two words (Jumaane Williams)? Why would I decide it was too much work at that point to make the revisions?

The only reason would be if I was making a statement about political expression. But in that case, I would have argued that. I didn't. Instead, I argued about how there must have been a technical issue with the portal causing the submission to fail to go through. I argued that– until I found out at the hearing that someone had closed the portal on the receiving end and no one had actually checked to see if my submission was there.

Lack of Due Process #4:

Background:

On page 22 line 23, Justice Hagler stated "That is contradictory to the affirmation of [CFB] counsel where she stated… [Multiple candidates] missed the deadline and all were treated the same way. At that point, the emails and phone call between the 2021 NYC Public Advocate candidate, Theo Bruce Chino Tavarez, and CFB attorney Katharine Loving, were discussed. "Theo Chino" ran in the same race as I had. Theo Chino had also submitted a "non-compliant" voter guide profile. Theo Chino's full profile was included in The_CFB's print and online voter guide.

Justice Hagler concluded on page 24 line 11, "The candidate, Chino Theo, reached out to the Board, not vice versa... It doesn't look like [the revised profile] was initiated by the defendant. It looks like it was initiated by the candidate."

On page 26 line 14, the Judge said to me, "You're asking for special treatment.. You're asking for better treatment than anyone else received..." and then he went on to reference Theo Chino, a similarly situated male opponent of mine in the 2021 Public Advocate race.

Argument:

Justice Hagler relied on a false assumption about Theo Chino's interactions with The_CFB to draw a false conclusion about my behavior. The Judge appeared to come to the false conclusion that Theo Chino initiated contact with The_CFB and acted differently than I did. Theo Chino– my opponent in the 2021 NYC Public Advocate race and my potential opponent in future races– still signed an affidavit to support me in this matter. He affirmed that for the same "error," we received disparate treatment.

CFB Counsel already knew Chino could not have initiated the phone call with The_CFB because no one could. Throughout COVID and throughout the Public Advocate race, The_CFB communicated through MS Teams and CFB employees had to initiate the calls. CFB Counsel had an affirmative duty to correct the Judge based on ABA Rule 3.3 Candor Toward the Tribunal, especially when Justice Hagler clearly drew a distinction between me and Chino. Yet CFB Counsel chose to profit off this misrepresentation.

Prior to the hearing itself, my attorney told me that I could bring witnesses to testify on my behalf. I had three witnesses: Theo Chino, a former CFB employee who could testify as to these employees' disparate behavior in past election cycles, and me. On 10/21/21, the night before the hearing, I emailed my attorney confirming that everyone was prepared to testify on my behalf. I spoke to Fish on the phone later that evening. He dissuaded me from having my other two witnesses testify. He did not give me the option of submitting affidavits for the Judge to review. The Judge did not allow me to testify at the hearing, so all we had was the original handwritten affidavit I had submitted at the start of the case. It was devoid of detail. My bare bones affidavit was compared to Perskie's oral testimony. Perskie misrepresented facts in the CFB's favor. My attorney also misstated facts and said I committed errors, which I didn't commit. I texted him the true answers to the Judge's questions but he did not look at his phone before answering.

After the hearing, a radiologist from Lenox Hill Radiology called me about a different matter. Upon hearing all this, he recommended Theo Chino and I both file affidavits about the truth of what happened. We wrote them. I paid Fish to review the documents and file them. He did not file the affidavits effectively. I only discovered this in late August 2022, almost 10 months' later.

Nevertheless, I had a copy of Chino's affidavit, which I sent to Perskie showing that– for the same offense– the CFB co-authored his voter guide submission and included him in both the print and online voter guide. She ignored the affidavit and excluded me from the online voter guide.

*Fraudulent Misrepresentation #5: Background:*

*Background:*

On page 19 line 12, CFB General Counsel stated, "I would like to just clarify a couple of things in terms of The_CFB's ability to simply make a correction to statements that we received." After that, CFB Counsel proceeded for several paragraphs to talk about the "substantive differences between the original video script that I submitted and the revised video script."

The video script should never have been an issue in this injunction hearing. The_CFB had approved the script and I had filmed the video on August 17, 2021, more than two months before the hearing. The entire hearing was about the print and online voter guide. I was already approved for the video voter guide, making Perskie's comments irrelevant and prejudicial.

On page 8, starting at line 5, Justice Hagler stated, "... You mentioned that [Nampiaparampil's submission] referred to the public advocate's name. I thought also the wife's name; I think it was both names, but okay. And then there needed to make a revision..."

The_CFB Counsel's memorandum of law referenced the fact that I brought up the incumbent's wife. There was no rule barring me from mentioning her– so I could if I wanted to. But in this case, I was excluded solely for mentioning the candidate by name. I had removed her name from my video voter guide submission, which had already been filmed.

*Argument:*

At the time of the injunction hearing, CFB Counsel was aware Justice Hagler believed The_CFB had multiple reasons to exclude me from the voter guide. CFB Counsel was also aware its own employees had really cited only *one* reason that they had excluded me from the print and online voter guide where I had referred to my opponent by his name rather than by his title. Counsel knowingly chose to hide this material fact in violation of ABA Rule 3.3: Candor Toward the Tribunal.

*Lack of Due Process #6:*

*Background:*

In the Affirmation she submitted for the hearing on 10/20/21, which I first read on 10/21/21, CFB General Counsel stated point #15, "Thirteen candidates have no profile in the voter guide due to missing the deadline. No candidate who missed the deadline for submission has a general election-specific profile in the voter guide."

CFB General Counsel crafted her statements to include the term "general election" because The_CFB employees shaped the majority of candidate submissions before the primary election. The modifications were made before the primary– not the general. The_CFB co-authored Theo Chino's submission before the Democratic primary election. Because I did not have an opponent in my primary, the timing of my submission was different.

.

At the hearing, CFB General Counsel testified that The_CFB had not assisted others, or modified any candidate submissions, for the general election.

Justice Hagler later repeated The_CFB General Counsel's statement– with the exclusion of the modifier "general election"-- and stated that The_CFB had not helped any candidates, which was a false statement.

*Argument:*

The reason for this confusing language including "general election" is because the phrasing was intended to deceive. The question was whether The_CFB assisted other candidates who were similarly situated to me– like Theo Chino– not whether I ran in a primary election. The_CFB proactively contacted, collaborated with and co-authored other candidates' submissions.

My voter guide profile was submitted to The_CFB before the general election. The_CFB Counsel aimed to hide this fact from the Court with this statement to make it seem as though The_CFB had not helped any candidates before any election.

CFB Counsel had an affirmative duty to address Justice Hagler's false statement but they did not. Then Justice Hagler added that I was seeking "special treatment," which again was a conclusion based on the preceding deceptive statement.

Conclusion:

Even though my attorney, David M. Fish, did not object to The_CFB's prejudicial ex parte communication with the judge via voter guide prior to the hearing, or Perskie's dual role as both a testifying witness and the lead attorney for The_CFB in the hearing itself, or her introduction of new facts at the hearing, or her introduction of irrelevant defamatory testimony about me, or the hearsay testimony of anonymous witnesses, or her contradictory factual statements throughout the hearing, and even though my attorney did not wait for me to text him the answers to the Judge's factual questions before he erroneously stated that I had committed certain actions which I have factual evidence (in the form of emails, affidavits, and timestamped screenshots) that I did not do– as an attorney licensed to practice law in the state of New York– CFB General Counsel Perskie should have adhered to a professional code of conduct of her own volition.

It can be inferred from Perskie's actions that she was fully aware of Duhalde's mixed motives of racial animus towards East-Indians/ Asian-Americans, misogyny, and intent to commit fraud. That is the reason she deliberately chose not to obtain an affidavit from him before the October 22, 2021 injunction hearing on the voter guide even though he personally reviewed my voter guide submission and even though he is the only one who communicated with me about it in the critical 8-week time period before it was published. Duhalde is the one who made the initial decision to delete me from the voter guide.

Duhalde regularly published online about how his "other actions" besides his "one vote" would bring about transformative changes for the DSA. He wrote about the "revolution" he was planning and leading. He and others posted pictures on social media of him petitioning, campaigning and fundraising for DSA candidates in total defiance of The_CFB's code of conduct. I saved timestamped screenshots. Anyone who did a cursory search of him on the internet would read about his work. He even boasted about it on his LinkedIn profile, which is most likely reflective of his resume. Nevertheless, he refused to

go work for the DSA. Instead, he chose to work for the nonpartisan CFB and assigned himself to the campaigns of unsuspecting non-DSA candidates like me and Szuszkiewicz.

Deliberate Indifference and Failure to Supervise:

Under color of law, Perskie denied me my constitutional right to due process in the hearing. When the City of New York sent CFB General Counsel Perskie to the 10/22/21 injunction hearing as its legal representative with decision-making authority, it knew she and her co-counsel, Tim Jutte, might face difficult legal and ethical situations. Since Perskie and Jutte knew that the voter guide had already been mailed out, they knew they should disclose whether the CFB had engaged in an ex parte communication with the Judge. As lawyers licensed in the State of New York, they knew they might face a situation where Candor Toward the Tribunal was required. Perskie knew that acting as both an investigator and the sole witness for the defendant as well as the lead attorney for the defendant in the hearing might have an negative effect on the other side's due process. Perskie knew that she would have to avoid making contradictory testimony as a person sworn to tell the truth. She and Jutte made conscious and deliberate choices at the hearing.

In Connick vs. Thompson (2010), the Supreme Court ruled that **deliberate indifference** could be found if the Attorney's office "was certain that [the attorneys] would confront the situation where... the situation involved a difficult choice... such that additional training, supervision, or monitoring was clearly needed... [and that the] wrong choice by [an attorney] in that situation will frequently cause a deprivation of an accused's constitutional rights."

Under Section 1983, a municipality can be held responsible for failing to supervise its employees if their actions can foreseeably result in constitutional violations.

In this situation, if due process was followed, and if the CFB had in fact "lost" at the injunction hearing as a result, the CFB would have had to include my photo, background, and platform information in its voter guide educational materials– as it had voluntarily done for my similarly situated opponent, Theo Chino. Under Section 1983, CFB General Counsel, having full decision-making authority at the hearing, deprived me of my constitutional right to due process. The CFB's real goal, which it achieved that day, was to deprive me of my constitutional right to free speech and political expression. The_CFB also violated its own legislated purpose, which was to give voters an opportunity to learn about their candidates for office. It engaged in its routine practice of "candidate suppression."

The real outcome is that my medical practice was harmed by the voter guide. This affects my patients, employees, and my dependent children— all during the midst of a pandemic.

The_CFB had an obligation to act in the public interest. As ordinary citizens and as a private business, my children, my small business, and I did not carry those same obligations; yet we reversed our roles. With daycare closed, my husband and I sent our child away for 8 months so I could treat the patients. I was pregnant with our second child in 2020. She was born with COVID. The infection caused me to go into labor. *We served the people of this City.* We risked our lives and even personally subsidized and financed medical care for hundreds of people during the height of the pandemic.

Even the City of New York has been harmed. I served as an expert witness on numerous cases on behalf of the City. I coordinate care with healthcare workers at city hospitals because we share patients. I am an Associate Professor at NYU Grossman School of Medicine/ NYU Langone Health who teaches staff at these hospitals. I also have patients who are city workers— I even have patients who are Campaign Finance Board employees.

Perskie acted with deliberate indifference for how the voter guide, and her fraudulent misrepresentations and unethical and unprofessional tactics would affect all of these people.

---

**ACT FIVE:** **Date of Occurrence: October 12, 2021**

**Date of Discovery: October 12, 2021**

**Place of Occurrence: Worldwide (Published Online)**

**FACTS:**

In order to have a mandatory televised debate on CBS, NBC or ABC, my supporters and I had to fundraise at least $113,878 by a preset deadline and then spend that amount as well. When I asked for the deadline, a CFB employee originally emailed me the wrong date, creating the false impression that I had more time than I did.

Because I had fundraised most of the money (somewhere between $150,000 and $170,000) towards the end of the election cycle, I had to spend almost $100,000 in a couple of hours to meet The_CFB's preset spending criteria. The credit card processor The_CFB had chosen (Stripe) hadn't deposited the funds into the account so we hadn't been able to spend the money we fundraised earlier. Also, most of the things we needed were not available for purchase on such short notice and the CFB had defined rules about what items it would count towards the spending threshold.

I believe I spent about $85,000 from the campaign account in a matter of hours before my bank, Bank of America, froze my personal, business and campaign bank accounts. No amount of identity verification tests would unlock the accounts.. Before Chase and Mastercard also froze my credit cards, I believe I was able to spend an additional $20,000 on palm cards, flyers and lawn signs. The expenses were all clearly campaign-related. We calculated the incoming and outgoing receipts and we had met The_CFB's criteria. Our fundraising and spending was on the order of ~$150,000-$170,000 total.

Of note, I was under the impression that my accounts were frozen because of excessive spending in a short time period but I later discovered from credit credit reports given to me by my bank that– for the first, second, and only times in my 30 years of earning money– my secure financial information appeared on the Dark Web. This happened just days after I provided my information to the CFB in April 2021 and July 2021. This had never happened in my 20 years working as a physician independent contractor. According to a Bank of America representative, abnormal activity in September 2021, on the date of the critical deadline for fundraising and fund spending for the debate, in conjunction with the two Dark Web alerts, caused Bank of America to shut down all of my accounts.

A FOIL request I submitted to the CFB revealed that the CFB took seemingly no precautions to safeguard either mine or my donors' financial information other than to ask their own employees to follow the employee handbook, which Duhalde for example regularly and overtly defied in full view, and with approval, from decision-makers at the CFB. Also, the CFB wrote to me that it has no tracking system for which employees access candidates' confidential identity and financial information or for who accesses their donors' confidential identity and financial information. This suggests it has no way of figuring out who may have put my personal information on the Dark Web and caused my business to come to a halt. This is different from the healthcare system where patient privacy laws necessitate that we track this closely.. These actions jeopardized patients' lives because I could not pay for their medications, supplies, and personal protective equipment. Multiple doctors donated medications and medical supplies to my practice so I could continue to treat the patients.

After my bank accounts were frozen, I had a virtual meeting with my liaison from The_CFB, Jaclyn Williams, where I described my problems with the frozen debit card on the day of the deadline. She told

me I should have started spending earlier– even though the funds wouldn't have deposited into our account yet because Stripe took so long to deposit cash. (The CFB barred us from using Square, which is the credit card processing app we use in my private practice). I was not worried about her comment because I knew we had spent well over $150,000 and we only needed to spend $113,878 to meet the spending threshold.

I posted on my social media that we had succeeded in meeting the deadline. Days elapsed before The_CFB made any announcements. Then The_CFB abruptly and falsely sent out a worldwide press release to all the political reporters– local, national and international– in NYC that I had *not* met the criteria for the televised debate. This immediately made me look like a liar and a fraud.

I immediately contacted the CFB. The_CFB told me that– although we had met the fundraising requirement for a public debate– that since I hadn't met the "spending" requirement, it was denying me the mandatory televised public debate. The_CFB said we hadn't spent all the money on the campaign debit card, but rather on a credit card, so it did not believe I had satisfied the criteria.

The_CFB could cite no law that requires that campaign spending be done on a debit card.

This quasi-judicial decision was made without any notice for a hearing to review the matter. There was no due process.

The_CFB posted and tweeted a press release on 10/12/21. The_CFB referred to me as "Devi Nampiaparampil," again without the "Dr." title unlike Dr. Jeff Ascherman, and wrote, "This debate is not required under city law since two or more candidates have not met the nonpartisan, objective and nondiscriminatory criteria developed in the Campaign Finance Act. The candidates are appearing voluntarily and a "Leading Contenders" debate for this office will not be held." Adjacent to this message, The_CFB published the true criteria for the debate, which we had met. It omitted the new criteria it had cited about credit card spending vs. debit card spending.

The incumbent, Jumaane Williams, agreed to a televised debate with me and the CFB agreed to sponsor it. The two other candidates for Public Advocate in the general election: Tony Herbert (a Democrat who had been endorsed by the Conservative Party) and Devin Balkind (the Libertarian) were excluded from this televised debate.

Normally in a major election in a metropolis like New York City, many candidates will run for office. The petitioning process is a major obstacle so only a small number of candidates will make it to the official ballot. The media will not cover all of them; generally, it will cover the candidates that are deemed "viable." This standard is often directly related to fundraising. If a candidate can raise more money, he or she is deemed more viable and more likely to win.

In my case, I had raised approximately $80,000 in the week before the voter guide went out. In the disclosure period prior to the press release, I had fundraised more than Jumaane Williams (the incumbent), Tony Herbert, and Devin Balkind combined. This was unexpected for a Republican candidate in a citywide election in NYC where it is difficult to convince someone that even a $10 donation will not be a waste of money and a futile effort.

Because viability is linked to fundraising, political reporters often turn to the CFB for indications of viability. In my case, the CFB first deleted me from the print voter guide so reporters could not even report on me. They weren't even sure if I was a physician. I was also marked with a badge of infamy. My information was missing from the CFB website other than my name. The CFB posted our fundraising with distorted artistic representations, making it appear to the media as though Tony Herbert had raised more money than me– even though I had actually fundraised approximately double what he had fundraised.

Then with its press release about the debate, the CFB gave the media the impression that I was not viable. In fact, the CFB essentially told every political reporter in the world that reported on NYC that I had not earned the debate. Instead, the nonpartisan Agency implied that it, along with Jumaane Williams, were giving me a handout. It furthered the impression they had already created, which was already sensed and repeated by the Judge, that I had somehow asked for and received "special treatment" rather than "fair and equal" treatment.

I had met the fundraising criteria for the debate. That is the difficult part and no one questioned it. The spending part should be easy. No politician should have difficulty spending money. The only reason I had any difficulty is because my campaign's bank account was frozen. But I still spent the requisite amount of money on campaign materials within the time frame.

Under Section 1983, the CFB denied me my constitutional rights to due process and to free speech. The issue of spending the campaign's money on a credit card rather than a debit card was a pretext to

deny me political expression. By both portraying me as a liar (since I said I met both the fundraising and spending criteria) and by making it appear as though I had received a handout– in the form of a televised debate– either because I was East-Indian/ Asian-American or because I was a female or both, decision-makers at The_CFB consciously, deliberately, and predictably sparked a torrent of angry hate speech against me and my employees in a time of already rising violence against Asian-Americans.

My employees were subjected to these hostile angry callers because the phone number for my private practice is easily accessible on the internet. There were so many angry calls that we couldn't receive the calls from the patients during COVID. New York City was dealing with Delta and Omicron at that time and our primary objective was to protect New Yorkers. I had to buy approximately 10 new phone numbers to reroute calls just for the voicemail capacity, so that we wouldn't miss any of the patient calls. My four receptionists still had to answer all the calls or listen to all the messages because we couldn't risk missing a patient call for fear of a patient having a dangerous medical issue or complication.

People were furious that Tony Herbert, a Black man, had been denied a chance at a televised public debate when I had been given one that the CFB falsely said I hadn't earned. Again, predictably, I faced more threats of violence from anonymous callers who knew the exact address of my medical practice and the exact hours I would be there. The_CFB, already exhibiting disparate treatment based on race and sex, then with deliberate indifference as to the outcome, sparked more tensions with this new "badge of infamy" it affixed to my name.

In terms of the debate, there was no guarantee Williams would actually appear since it was not mandatory. If there was no debate, the public would never have a chance to hear my thoughts or platform before voting. Also, I would never have a chance to use the valuable air time to clear my overall reputation or to improve the employment prospects for my business.

Although the 2021 debates for citywide office aired on private networks (NBC, ABC, and NY1), they were all sponsored by The_CFB. The_CFB determined the criteria for the debate and paid for the air time and publicity. Four candidates in the 2021 general election met the criteria for the televised debate: Eric Adams, Curtis Sliwa, Jumaane Williams and me. The_CFB awarded Adams and Sliwa two televised debates or major networks (ABC and NBC), which almost all New Yorkers would have access to. However, The_CFB simultaneously determined that my debate would air on NY1, a channel restricted only to certain members of the public who had paid subscriptions, based on the City's own franchising agreement. There was disparate treatment between the all-male citywide debate and the

citywide debate with a female. There was disparate treatment between the citywide debate that had an East-Indian/ Asian-American and the citywide one that did not.

The_CFB heavily promoted the citywide debates between the two male opponents and had hardly any publicity or promotion- other than a minimal amount on the day of the debate- for the citywide debate involving me as the only female and only Asian-American candidate.

According to its previously published criteria, there was a second opportunity for a televised mandatory Public Advocate debate if we met a different set of criteria. However, after I fundraised more than expected as a first-time candidate, The_CFB issued a press release that it was canceling that "Leading Contenders" debate, thereby depriving me of another opportunity to speak to a larger audience.

This cancellation occurred without any notice other than finding out by means of a press release posted on the web or due process as to how I could appeal the decision.

On 1/14/22, prior to leaving her position at The_CFB, Jaclyn Williams told me she reviewed my financial information and determined I had actually met the mandatory debate criteria. She said– regardless of the credit card/ debit card issue– because of the amount I had already spent, I would have met the criteria. She told me that before denying me the mandatory debate, The_CFB had caught a data entry error we made in The_CFB's electronic platform. The employees knew it was a data entry error because they reviewed the attachments in the transactions to see the paper receipts and details of the spending.

If my small campaign team had seen and corrected the typos in the days that elapsed between our submission and The_CFB's press release, The_CFB might have granted me the mandatory debate. Although The_CFB employees were aware of this data entry error, and aware that I had actually met the fundraising and spending requirements, they purposely withheld this information. They willfully chose to publish the false statement that I had not met the criteria. They willfully chose to deprive both me and the public of the debate.

After my meeting with Jaclyn Williams, I searched through The_CFB's web platform to find the errors but I could not find them. I did not understand how to use its proprietary system. The CFB mandates that candidates use its web platform but does not provide Information Technology (IT) or Help Desk services to the candidates. There is no user manual for the system, no "Help" function built into the

platform, no pre-recorded videos on the internet to help with trouble-shooting, and no recordings of any training sessions. I was entirely dependent on the caprice of CFB employees who Egerton chose to assign to my campaign for assistance.

CFB employees dissuaded my Treasurer and me from making appointments with them. They overtly canceled appointments with us for no apparent reason. The_CFB even blocked my registered campaign email address. This made it impossible to communicate with them since they were working from home and could not be seen face-to-face. I tried going to 100 Church Street but security told me no one was there. CFB employees did not answer their phones because they were not in the building. We could only communicate with them if they initiated an MS Teams virtual meeting with us. But in order to do that, we needed to email them and my email address was blocked.

Of note, my campaign team and I correctly classified "Dr. Devi For NYC's" fundraising and spending on paper records and receipts consisting of over 1000 transactions in bank statements, credit card statements, individual contribution cards, and paper receipts. But The_CFB chose only to look at the C-smart platform, which we had stated numerous times we didn't understand and we needed help with.

Almost a year later, on 1/9/23, in a virtual meeting with Hannah Egerton, Egerton explained how to correct the errors when an auditor noted "missing" money in the electronic web platform but no missing money in the bank statements and other paper records. Egerton found the errors in less than 90 minutes and I was able to correct them the same day.The campaign immediately crossed the mandatory debate spending threshold, albeit two years too late.

In the same phone call with Egerton, I discovered a third way I could have met the criteria: by writing a check to myself on 9/29/21 for the amount I spent on the credit card. Even if I didn't cash it (because the account was temporarily frozen on the day of the deadline), The_CFB would have considered it a direct payment from the bank account. None of these options were presented to me after the deadline in 2022 when the CFB decided to audit me for the "missing" money I had spent.

Egerton and I had another virtual meeting on 3/29/23. On that day, even though my campaign had not spent any additional monies, the campaign spending had already increased to ~$178,000 simply from Egerton "assisting" me in correcting these various data entry and data interpretation issues. It is a huge jump from below $113,878 to approximately $178,000. At each point in this campaign, the CFB has used spending against me. When I wanted to spend money at the start of the campaign, the CFB told

me I could not spend money until I had raised it. This turned out to be a false statement, which I relied upon. It caused me harm. Later, at the time we needed to meet the debate threshold, the CFB determined I had not spent enough money to meet the threshold and again used spending against me. Then after the campaign was over, the CFB found the money I already disclosed that I spent, which they are now using against me to say I "overspent" on the campaign. Either I underspent or I overspent. It can't be both at the same time.

With the same set of facts that I had already argued, the CFB said I underspent and did not meet the debate threshold. Then during an audit which took place while I was suing them in New York State Supreme Court– in which I was deprived of an attorney for both sets of litigation– because the CFB considered attorney representation to be a campaign expense that I could be prosecuted for, the CFB suddenly found the money and determined I had overspent on my campaign.

Argument:

Reasonable people understand that raising money is more difficult than spending money. I would have been able to spend the money if the campaign bank account was not frozen. Regardless, all of these machinations about debit cards vs. credit cards and checks vs. credit cards were all fraudulent misrepresentations and omissions serving as a pretext.

Aside from the monetary value of airtime on a major network that would have been given to me if I had been deemed viable by securing a "mandatory" debate, the credibility and viability afforded to me of meeting the fundraising criteria was stolen from me as well. The media uses the Campaign Finance Board's press releases about funding thresholds to gauge "viability." When a candidate seems more viable, the media will grant that candidate press coverage. Without that stamp of approval, the candidate has minimal chance of ever winning. By regularly creating the impression that I was not viable, The_CFB encouraged other outlets to reinforce its same message, which they did. Because I was articulating a different message with fact-based statements– that I was a serious candidate who was actively fundraising, and that I was a serious candidate who had met the fundraising criteria– I also appeared to be a fraud. This had foreseeable consequences.

People articulated doubts about whether I was a professional doctor. They accused me of scamming people out of money and their social security numbers. Others thought I was interfering with an election. The substantial danger of injury to my reputation from The_CFB's false statements were

readily apparent. Their statements lowered me in the community and deterred third persons from associating or dealing with me.

With its actions, The_CFB caused harm to me, Metropolis Pain Medicine PLLC d.b.a. Devi Nampiaparampil MD, filing taxes on Schedule C under "Devi Nampiaparampil," and my dependents: AT and RT.

The_CFB's false statements are disparaging to me as a professional and commercial entity because they impute to me a crime of moral turpitude (fraud) for which– if the charge was true– I could be indicted and punished. In fact, the Defendant, The_CFB, is currently investigating me and has been since October 2022. Egerton sent me her threatening warnings about my audit immediately prior to filing deadlines for my state litigation. Furthermore, the CFB denied me an attorney in any of these proceedings and investigations stating it would be a campaign expense that could be prosecuted as overspending, again denying me due process under Section 1983.

The_CFB's false statements significantly prejudice me in three of my government-licensed professions: as a physician, as a laboratory scientist, and as one who works with radiation and radioactive substances. The_CFB's false statements also prejudice me in my other professions as a small business owner, an expert witness, a professor, a journalist, a broadcaster, a movie director, an actor, a model, and a politician.

Under Section 1983, the CFB is responsible for violating my right to due process and creating the foreseeable harm that occurred to me as a result of its own actions. In Kniepp vs. Tedder (1996), the U.S. Court of Appeals Third Circuit determined that the "state-created danger" theory is a viable mechanism for establishing a constitutional violation under civil rights law if (1) the harm ultimately caused was foreseeable, (2) the state actor showed willful disregard for the plaintiff's safety, (3) there existed some relationship between the state and the plaintiff, and (4) state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Causation and Foreseeable Consequences: Defamatory Portrayal As A Fraud:*

Devi Nampiaparampil the Individual Candidate:

Through its actions, The_CFB eroded trust and compromised actual and potential doctor-patient relationships. A new clientele scheduled patient appointments. These individuals had the false impression I ran a drug trafficking opioid "pill mill" even though I previously worked for the Department

of Veterans Affairs and collaborated with the Department of Justice to combat the opioid crisis on a large scale.

Others– who already had doctors treating them– scheduled appointments and unleashed their anger on me and my female employees creating a hostile work environment.

One patient, who specifically mentioned the Campaign Finance Board by name after a spine procedure, who also acknowledged the hoped-for benefits from the spine procedure weeks later, still reported me to the NYS Department of Health for perceived character flaws. (The Department of Health found no reasonable grounds to investigate). My impression from the event was that the patient wanted to say something negative about me after she learned about the Campaign Finance Board, which she referenced during her visit. However, she still believed I was an excellent physician, which is why she wanted me to perform her surgical procedure first.

I have been a physician for 21 years and never been sued for malpractice, negligence, or any employment-related issues. I have never been investigated for professional misconduct. As a result of The_CFB's misconduct, I have to screen the people who enter the practice in different ways because I cannot be sure if they intend to harm me, my employees, or the patients. This has significantly restricted commerce particularly since my practice serves New York, New Jersey and Connecticut (the Tristate area) and has insurance contracts with other states. I treated patients from many states and territories, particularly during the pandemic, in-person and through telemedicine. <u>Under Section 1983, I have a dormant commerce claim.</u>

The_CFB is directly responsible for this ongoing wave of "nuisance" complaints and potential malpractice suits that waste time and resources and that interfere with commerce and the provision of medical care. After I declared my run for office, the number of referrals to the practice increased significantly and the patient satisfaction appeared to be extremely high as well. The number of negative interactions skyrocketed after The_CFB mailed out its print voter guide to millions of people.

Political news reporters, from outlets such as PoliticsNY/ Schneps Media, refused to acknowledge me as the nominee of the Republican party. Instead, in the days before the election, they erroneously reported that one of my competitors was the Republican candidate and refused to correct the error until long after the news article had been widely distributed. These reporters followed The_CFB's narrative that I was not a legitimate candidate. Therefore, they would not present me accurately to the public as a serious choice.

1010 WINS parroted The_CFB's message that I was either careless or a fraud. It published an article listing my Top 3 Issues followed by the words, "None submitted," implying I was either too careless or uninterested to respond to its request or that I fraudulently and ineffectively had no plans to deal with any issues. 1010 WINS had never contacted me for any comment. It simply copied what The_CFB had published in its offensive voter guide.

*Causation and Foreseeable Consequences: Race and Sex Discrimination:*

Despite the fact that I fundraised almost $80,000 in a week's time, more than all of the other candidates' combined including the incumbent during the previous funding cycle, The_CFB repeatedly broadcast to media outlets my lack of viability as a candidate, causing them to ignore me, deny me interviews, and write disparaging comments. On October 7, 2021, the New York Post described me as a "token" candidate, a term often used to disparage the achievements of women and minorities.

I had limited opportunities to describe my ideas and my platform. Because I was also deleted from The_CFB voter guide, I had no way of reaching NYC voters other than through my own website. But I could not attract people to look at my campaign website without first sparking public interest in my candidacy. It was a Catch-22.

After journalists from Gotham Gazette (published by Citizens Union) and Manhattan Neighborhood Network (MNN) witnessed The_CFB's behavior, they followed suit. MNN is a public access network that states on its home page, "We believe that democracy is best served by introducing you to *every* candidate in *every* race: who they are, what they stand for, and how their decisions will impact you, our borough, and our city." As a registered 501c(4), Citizens Union receives federal funding in the form of a tax abatement and is barred from discrimination based on race and sex and/ or restrictions in freedom of speech.

Nevertheless, Ben Max, one of the lead reporters at Gotham Gazette, as part of his 2021 DecisionNYC series, interviewed the other four Public Advocate candidates– all male, and none of them East-Indian or Asian-American– and posted their interviews on YouTube on March 12, 2021 (Theo Chino), April 23, 2021 (Jumaane Williams), May 18, 2021 (Tony Herbert) and October 30, 2019 (Devin Balkind). Balkind was not interviewed in the 2021 election cycle but his past interviews about his core platform and ideas still appeared in internet searches about him and about the Public Advocate race.

Max and MNN staff ignored or denied my email requests for an interview on 7/8/21, 9/4/21 and 9/23/21 without explanation.

At that time, **Frederick Schaffer, Chair of The Campaign Finance Board**, served on both the Board of Directors of Citizens Union/ Gotham Gazette and of the CFB. He had direct control and oversight of both entities. Schaffer was fully aware of his employees' actions since Nazly Suarez, Shirley Chen and I all submitted public testimony as to what I had experienced before him, Loprest and members of the public. He acknowledged my testimony. I was cut off at about the 3-minute mark so I followed up with written testimony, which was posted on the internet. The session recording is publicly available and I also have a copy of both the oral and written testimony.

The disparate treatment was not based on political party. Max regularly interviewed other members of my party for the DecisionNYC series. We had no apparent personal conflicts since we had never met before.

*Causation and Foreseeable Consequences: Sex Discrimination:*

The_CFB effectively transmitted its message of sex discrimination to the media. 1010 WINS tracked down a photo of me eight (8) months' pregnant from 2018, almost four (4) years earlier and published it days before Election Day, signaling to voters I might not perform the job because I was about to take maternity leave and possibly go part-time. I was never pregnant at any point during the campaign. The irony was that– when my child was born during COVID– I didn't take any days off. I treated patients while I was in labor and just hours after my C-section. I have my medical records, the office schedule and insurance claims as evidence that I treated patients while my baby and I were hospitalized for COVID and a C-section.

My daughters made sacrifices and are potentially two of this country's youngest heroes. I could have temporarily closed my practice. We could have left the city and stayed safe at home, as many pregnant mothers chose to do during COVID. We chose to help the public and treat patients during the crisis. 1010 WINS purposefully disparaged me, my newborn baby and my toddler (RT and AT) after receiving The_CFB's press release.

*The_CFB's Disparate Relationship With The Media*

The_CFB also denied my team access to the footage and ignored requests for the footage from East-Indian and Asian-American journalists. This copyright-free footage could have helped us in efforts to inform voters about my platform. This disparate treatment based on race harmed my reputation and my future potential economic opportunities within this group. The_CFB cooperated with reporters from Spectrum/ NY1 and with Ben Max from Gotham Gazette/ MNN. But it ignored the East-Indian and Asian-American journalists, including myself. These reporters texted me and emailed me afterwards to tell me about their interactions with Matt Sollars at the CFB.

Sollars responded that he was following CFB official policy.

*The_CFB's Disparate Impact in Setting Rules of the Debate*

The debate took place on Spectrum/ NY1. As a sponsor, The_CFB **set a policy** whereby it denied me and Jumaane Williams access to hair and makeup artists, the use of mirrors and the use of cell phones (which have a camera/ mirror function) in the studio. As the only female candidate in the debate, this had a disparate impact based on sex. Members of the public and other journalists covering the debate considered what I looked like when assessing me. I didn't even know if my required mask had smudged the lipstick on my face, making me appear unprofessional, before I appeared on television. Since my photo had been deleted from the voter guide, this televised debate would be the first time that people would see me, as opposed to the incumbent candidate, so my appearance would be relatively important for creating a first impression.

Conclusion:

The_CFB denied my U.S.C. Section 1983 First, Fourth and Fourteenth Amendment rights. Under the color of law, The_CFB made a policy, a final determination, about whether I had met the criteria for a televised debate without any notice or due process. The CFB restricted my protected free speech. It also unlawfully seized valuable publicity, in the form of air time on a major network, that I had earned. Instead, it attached a badge of infamy to my name personally and professionally, instigated a deluge of hateful diatribe, harassing calls and social media insults, and interfered with my business and my employment contracts. It treated me differently than other similarly situated candidates based on race and sex and denied me equal protection under the law.

**ACT SIX:**     **Date of Occurrence: August 17, 2021**

**Date of Discovery: August 17, 2021**

**Place of Occurrence: National (Over the Internet and Mail System)**

### FACTS:

On 8/3/21, I identified the incumbent Public Advocate's wife as a lobbyist. Her employer, Greenberg Traurig, had posted a press release stating she had been identified as one of the top 40 under 40 "lobbyists" in the City. Under the color of law, Duhalde emailed me from his CFB email address that I could be sued for defamation for calling the elected official's wife a "lobbyist." He suggested I alter my statements. I perceived his response as a threat and agreed to restrict my speech.

Using the threat of reputational harm, Duhalde used his governmental authority to coerce me into creating a video voter guide commercial for him that complied with his personal preferences rather than one that was in line with my views. This was a subsidy to his chosen candidate (my opponent) and a detriment to my medical practice. This was an extortion act sanctioned by decision-makers at the CFB. In fact, Perskie referred to it at the October 2021 print voter guide injunction hearing, for which I have a hearing transcript.

### Threat of Reputational Harm:

The threat of reputational harm has been established by the Supreme Court (United States vs. Avenotti). I changed my video/ commercial to comply with Duhalde's threat. But he still harmed my reputation.

### Payment Requirement:

I created the commercial that Duhalde wanted.

As an actor and a performer and a member of the Screen Actors Guild/ American Federation of Television and Radio Artists (SAG-AFTRA) union since 2008, I have received payment from major networks to appear on-air. I became a member for work I had performed for ABC/ Disney. The SAG-AFTRA union has previously given me a waiver to articulate my own thoughts on air. SAG-AFTRA was aware that I was running for citywide office and had met with me earlier on in the campaign.

I have worked as a paid model and spokesperson. I have worked as a print model for the Port Authority of New York/ New Jersey with my pictures up at the bus terminal. I have also worked as a "model" demonstrating how to use more complicated medical devices to perform technically challenging invasive procedures on patients.

I am a writer who graduated with Honors for my masters thesis at Columbia University Graduate School of Journalism. I published that thesis as a cover story/ home page article in Newsweek.

I have also won a Jury Award for my directing from the Directors Guild of America.

Duhalde, Perskie and other decision-makers at the CFB were fully aware of these qualifications because they were listed in the voter guide submission for the public. They ensured the public would not see them.

Under color of law, on August 4, 2021, Duhalde used his authority as a government employee, to co-opt my services as a writer to co-opt my script for the video voter guide, to take my services as a model, to seize my image to accompany the newly edited script, to take my services as an actor and broadcaster and co-opt my image, voice and likeness reading the script, an to take my services as a director and co-opt my vision to create a substantially different voter guide commercial. Perskie herself argued in Court (at the 10/21/21 injunction hearing) that the script was substantially different from what I had originally written.

According to the New York State's publicly available campaign contributions website, a man with the same last name as Duhalde living in the same apartment as Duhalde at the same time as Duhalde had already made monetary contributions to the candidate Duhalde endorsed, the incumbent Jumaane Williams, who I opposed in the 2021 Public Advocate race. The modifications to this video voter guide commercial represented an in-kind contribution to his chosen candidate.

Conscious Knowledge and Vicarious Liability:

The_CFB was fully aware of the extortion act. Duhalde already acknowledged that my video voter guide submission was fully compliant with the NYC Charter. He told me so in an email. Even on the

surface, it did not require any edits. After reviewing my submission, he knew I was a writer who had graduated from Columbia University Graduate School of Journalism.

He also knew we had very different political viewpoints and memberships. There was no need for him to use his official position to make recommendations on how I should edit my script. His plan was to obtain a "thing of value," which was a new video voter guide script and commercial, which could be substituted by the CFB for my original.

In the hearing that took place on 10/21/22 where I requested a temporary restraining order on the print voter guide, the point of contention was whether my use of the name "Jumaane Williams" vs. his title "Public Advocate" justified the exclusion of the entirety of my platform from public view in the print and online voter guides.

Although it was irrelevant since the video voter guide commercial had already been approved by Duhalde and filmed by Dru Gibson, The_CFB General Counsel Bethany Perskie introduced the topic of the video voter guide. Perskie described the extortion act in detail demonstrating she personally had conscious knowledge of the Act, as did multiple other Agency employees.

Furthermore, Nazly Suarez, Shirley Chen and I gave oral testimony to CFB Chair Frederick Schaffer and CFB Executive Director Amy Loprest about disparate treatment with both the voter guide and the mandatory debate. I followed that up with written testimony to the CFB on 12/16/21. The_CFB had multiple opportunities to investigate the extortion act. They chose to sanction it as part of their official policy.

Wire Fraud (Under U.S.C. Section 1343)

The quid pro quo exchanges about modifying my CFB-compliant script for the video voter guide and shooting my CFB-compliant script in its new form just to avoid reputational harm occurred over email. By interfering with the content of the video voter guide commercial and then posting it online, The_CFB committed wire fraud. All of our communications about the extortion act as well as many of the actual acts of reputational harm were over email, MS Teams virtual meetings, text message to my out-of-state Chicago-area-code cell phone, and over social media. These constitute acts of wire fraud.

Interference With Interstate Commerce:

Metropolis Pain Medicine PLLC d.b.a. Devi Nampiaparampil M.D. has a primary place of business in the Financial District of Manhattan. It regularly draws patients who commute from New York, New Jersey and Connecticut. We also have patients from Pennsylvania, Maine, Vermont and New Hampshire. We have "snowbirds" that travel from Florida. We draw patients from Puerto Rico. During the pandemic, I had patients traveling to other states and receiving telemedicine services. Because I worked at the Department of Veterans Affairs for years, we have service members that come to the practice. Because these individuals either live or work in New York and generally had an interest in my candidacy, they were more likely to pay attention to the voter guide and be impacted by it.

Physicians from other states refer patients to me. Our new patient referral rate dropped by 99% the month after the voter guide came out. Hardly anybody referred patients. One physician specifically told me it would be hard to refer patients after they received the voter guide— even if the patient and I were in the same political party. It was very possible the patients thought I was a fraud. There was no way to tell. If doctors referred them, the patients might turn against the doctors who recommended me, too.

I have served as an expert witness for multiple reputable law firms and Fortune 500 companies based outside of New York. Even the City of New York has consulted me about multiple cases. The City paid me at the rate of $675/ hour during regular business hours.

In January 2022, I was called to testify as an expert in a Pennsylvania Supreme Court case. One of the lawyers repeatedly expressed his concern about these portrayals of me as someone other than a doctor. He was worried a Jury member might have seen the voter guide and might make a negative comment about me to the rest of the Jury prejudicing all of them against me, and by extension, against his client.

Decision-makers at the CFB have engaged in a pattern of illegal activities characterized by fraud, the denial of the right to "honest services" (United States vs. Enron), extortion, facilitated harassment based on race and sex, facilitated political violence, and deliberate indifference to financial crimes perpetrated against campaign donors and candidates.

| **ACT SEVEN :** | **Date of Occurrence:** | **August 3, 2021** |
| --- | --- | --- |
| | **Date of Discovery:** | **August 3, 2021** |
| | **Place of Occurrence:** | **Over email** |
| | | **Affecting New York County, Richmond County,** |
| | | **Queens County, Kings County, and Bronx County** |

## FACTS:

The_CFB published its candidate video voter guide "commercials" for the NYC Public Advocate race on different dates. The videos for three of the male candidates were published in the spring of 2021. A fourth male candidate had his video published in the summer of 2021. The_CFB set my video as "unlisted" making it nearly impossible to find, so it is difficult to determine the exact publication date. My video was published on or about October 29, 2021, approximately eight (8) months after I registered as a candidate with The_CFB and also after early voting had begun. This was much later than The_CFB published the videos of the other candidates, so voters had minimal time to compare platforms or to learn about me in order to make financial contributions to my campaign. This made it harder to reach the matching funds threshold.

When people saw all the other candidates' videos and didn't see mine, it created the impression I was a fraud and that I was not running a serious campaign.

Even after The_CFB published my commercial, it removed all search tags from the video. For practical purposes, the video was invisible. Even if someone managed to spell my last name or searched variations of the term "Public Advocate," the CFB video would not appear.

The CFB also appeared to have added my name to my opponent's video. As a result, if people googled me– even if patients googled me for medical care– they would be redirected to his voter guide video. The CFB used my name to campaign for my opponent. Because the City has a much larger internet

presence than I do as an individual, my opponent kept outranking me in internet searches of me both as a candidate and of me as a business. This only occurred with the content that The_CFB created.

Argument:

The_CFB infringed on my U.S.C. Section 1983 First, Fourth and Fourteenth Amendment rights. Under the color of law, The_CFB restricted my speech, unlawfully seized my name, disparaged my business, interfered with my business and my employment contracts, denied my right to due process and treated me differently than other similarly situated candidates based on race and sex therefore denying me equal protection under the law.

---

**ACT EIGHT :** **Date of Occurrence: Between September 29, 2021 and October 12, 2021**

**Date of Discovery: October 12, 2021**

**Place of Occurrence: New York County, Kings County, Richmond County,**

**Bronx County, Queens County**

## FACTS:

After damaging my reputation through multiple acts related to its voter guide, The_CFB then gave $1,000,000 of taxpayer money to my opponent, the incumbent, DSA-endorsed and special-interest endorsed candidate, Jumaane Williams, to defeat me in the 2021 Public Advocate race. This widened a less than 2:1 funding disparity to almost 11:1.

Normally, under the matching funds program, which both Jumaane Williams and I subscribed to– as I understood it– candidates can receive 8:1 matching (public) funds if either: a) their opponent has also qualified for matching funds, or b) they can demonstrate why their opponent is a serious threat and why they need the money to win. In this case, my opponent, the incumbent, special-interest-endorsed candidate from the majority party was running against me– a first-time candidate- a challenger from the minority/ opposition party. When I asked The_CFB asking for a copy of Williams' "Statement of Need," . The_CFB initially ignored me. I wanted to post it on my social media, for my supporters to see. This information is supposed to be freely available for members of the public to access.

The Mayoral Democratic candidate, Eric Adams, had to submit a "Statement of Need" before receiving taxpayer money (matching funds) in his race. The_CFB waived this Statement of Need requirement for Jumaane Williams. When I asked my 3rd assigned CFB liaison, Jaclyn Williams, about this, she said The_CFB*'s official policy* was that Jumaane Williams did not need to submit a Statement of Need to receive the $1,000,000 of public funds to use against me.

The_CFB handed the incumbent this money while subjecting me to various campaign finance regulations that restricted my ability to use even my own personal finances in the race. The_CFB told me I was limited to spending no more than $6000 of my own money or it would charge me with campaign finance violations. The_CFB restricted my First Amendment right to free political expression while giving my opponent $1 million of taxpayer money with no explanation, and granting me no due process to challenge this policy decision.

Under *Monell vs. NYC Dept of Social Services*, since this transfer of public funds constituted an official policy decision by the municipality, The City of New York bears liability for the deprivation of my constitutional right to due process.

---

**ACT NINE : Date of Occurrence: On or about November 2, 2021**

**Date of Discovery: On or about January 5, 2022**

**Place of Occurrence: Kings County and Queens County (Violations Issued);**

**then New York County (1st Hearing March 2022);**

**then Bronx County (2nd Hearing June 2022)**

**FACTS:**

In early January 2022, I received eleven (11) summonses from the Department of Sanitation (DSNY) for illegal sign postings totaling $1025. The post office gave these to me even though they were addressed to my mother, Mary Nampiaparampil, who lives in Westchester County. They had the wrong address on them. Someone at the USPS rerouted the summonses to me because they recognized the name "Nampiaparampil." I am the only person with that last name in all of New York City.

At the start of 2022, our campaign had no money left. My CFB liaison, Jaclyn Williams, had told me I could stop filing campaign disclosures if I closed my campaign bank account, so I did– also in early January– immediately before I received the summonses.

An accountant familiar with The_CFB warned me that, because the violations were issued to "Dr. Devi For NYC" rather than my professional business "Metropolis Pain Medicine PLLC," I should not simply pay the fines. I was already at the maximum allowed financial contribution. If I paid the fines, I would go over that amount and be vulnerable to The_CFB again.

Normally, I would just ask others to contribute to my campaign. I received over 254,000 votes in the recent election so I should have at least one individual willing to contribute to this effort. But The_CFB had just ended the fundraising period in December 2022, so, according to my third assigned CFB liaison, Jaclyn Williams, no one else could contribute to my campaign. For each one of the DSNY violations that I paid, I would have a campaign finance violation. That meant 11 violations if I either paid the violations voluntarily or if the Court found me guilty of posting the signs. The_CFB would have access to the DSNY records since The_CFB regularly used OATH Court, the same forum as the DSNY used. Also, The_CFB regularly sent notices about DSNY fines.

Since my mother and I hadn't posted the signs, my first inclination was to call a lawyer. However, The_CFB could consider retaining a lawyer to be a campaign expense. If I paid the lawyer, it could be considered an over-the-limit contribution. If the lawyer volunteered their time to represent me in court, The_CFB could consider it an in-kind contribution and fine me. An accountant I spoke to said this could be true. The_CFB does not post violations and their penalties so it is hard to know what is allowed and what is not. Moreover, there is such variable enforcement that it would be impossible to know if they could prosecute or not.

I received these Summonses immediately after I received an email from Congressman Lee Zeldin's Campaign Manager and former Chief-of-Staff, Eric Amidon, stating that a panel he had assembled wanted to interview me to be his Lieutenant Governor running mate. Just days after I received that email, I received word I needed to appear in court to defend against these summonses.

Moreover, I was on the verge of receiving 11 violations for illegal postings, another 11 campaign finance violations for fines I would pay if I received a guilty verdict, and another 11 violations for potentially retaining counsel for each one of them, for a total of 33 possible violations. A colleague of mine who served with the state Board of Medicine, told me these violations are reviewed by the New

York State Board of Medicine. They would go on my professional record and could impact my ability to practice medicine for a lifetime.

Because I am credentialed through the Federal Credentialing Verification Services and Federation of State Medical Boards, if I had a violation in New York State, it would affect my licensing in ALL 50 states now and for my lifetime. He was not aware of any process to expunge these types of notations. At the time of these hearings, I was already slated to serve as one of the paid graduation speakers at Emory University and to tour the Centers for Disease Control. I was also serving as a consultant in multiple states including New Jersey, Pennsylvania, Maryland, Georgia, Florida and Arizona.

Rather than costing me even the face value of $1025, these signs were about to impact my lifetime earnings, which is an excessive fine and a cruel and unusual punishment. I was deprived of counsel because if I had hired a lawyer to help me get the charges dismissed, even if I was found innocent, I would still end up with a financial crime that would destroy my reputation. Moreover, I would have to report it to the Board of Medicine. Either one would damage my career. Once again, at a critical time, The_CFB portrayed me as a liar and a fraud.

As a result of all of this, I had to regularly block patients from scheduling at my private practice and spend almost every night away from my baby and my toddler for months. I also had to leave my at-that-time dependent mother who needed me as a doctor collaborating with her other treating physicians, a caregiver at home addressing her medical issues, and as her healthcare proxy. The_CFB was aware of all of this because I had emailed the Agency in December 2021 to notify them that my mother could no longer serve as the Treasurer of the campaign because she was dying. I sacrificed hundreds of hours doing legal research because I believed my entire career depended on it. I was forced to sacrifice valuable time with my family.

Under Section 1983, The_CFB deprived me of my right to counsel, as a matter of policy. This was an unlawful seizure of my personal assets, which I needed to use at that time. The_CFB also deprived me of a fair trial and due process, although I ultimately won in all 11 cases.

Malicious Prosecution Elements:

*A Proceeding Against Me:*

I was both the Candidate and the Treasurer of my campaign at the time of the March 2022 and June 2022 hearings in OATH Court. That meant I would be held personally liable for the debts of the campaign.

*Lack of Probable Cause:*

*Timing:*

I publicly conceded my race on multiple social media platforms on November 2, 2021. The DSNY alleged that I posted these signs on November 3rd and 4th, days *after* I already lost the election and conceded the election. I was not contesting the election results. People campaign in the days before an election, *not after losing*. Whoever posted the signs knew I couldn't get any votes— I could only gain fines, community service, campaign finance violations, a potential loss of my medical license, and other major penalties by posting signs on City property. One of the signs was in a location on City property that I couldn't even access to be able to investigate. That suggested only a City employee had the key or other access to get to the location to post the sign.

*Location:*

Prior to the June 2022 hearing, when I visited the locations of five of the eleven signs by car, I found deserted vandalized warehouses devoid of windows and covered in graffiti with stacks of torn tires in front, broken glass littered around the area, and abandoned trashed rusted vehicles stripped of their parts. The warehouses had barbed electrified wire on top. There were no people to be heard or seen. I told my team to stay in the car with the windows up and doors locked while I went out to take photos for the hearing.

We could only visit 5 locations because the others were too far away. No one on my mostly female team lived or worked near these locations. We all used the subway to commute. It made no sense for me to send them out with heavy lawn signs, on the subway with no car to transport or store the signs, to these remote locations at night in November when it became cold and dark earlier in the day. I had been physically assaulted during the campaign and everyone on my team knew that. They knew to take extra safety precautions because I had warned them many times. They knew the CFB's rules about where to post signs and had no incentive to break these rules.

If signs with my photo, full name, phone number and full medical practice address information were placed in these areas replete with graffiti threatening"snitches" and other people who helped the "cops," it was only to encourage more harassment and violence towards me and my medical practice. No reasonable person would believe I put my own name and phone number in these dangerous areas to get people to vote for me. I told everyone to stay in the car with the doors locked, the engine on, and one of them in the driver's seat.

The only reason I received the summonses at all is because USPS employees reviewed the lost mail and recognized the last name "Nampiaparampil." One gave me the summonses even though they were not addressed to me. I live in Manhattan and my mother lives in Westchester.

Meanwhile, a patient of mine who works in that field told me that the true offender may have stolen the signs from a dumpster after the election. Then that individual likely placed an anonymous call to DSNY and waited nearby and watched as the summonses were issued.

### Termination of the Proceeding in My Favor:

These whole process took place over the course of six (6) months with hearings in March 2022 and June 2022. I submitted the photos of the locations for the June 2022 hearing along with affidavits from four of my female supporters. The Court dismissed all 11 violations.

I was cleared of all these violations and I could not be accused of financial crimes since I represented myself in all 11 cases. Nevertheless, during the six-month time period, my reputation was tarnished with all these accusations of fraud. The illegal sign postings followed the same pattern as the voter guide, and the mandatory debate. People thought I was a liar.

### The_CFB's Involvement:

Upon receiving the summons, I went to OATH Court where these violations are tried. On two separate occasions, two different OATH Court employees told me the DSNY would have contacted The_CFB for my campaign's contact information.

On January 24, 2023, I submitted a formal FOIL request to the CFB for correspondence between the CFB and the DSNY. As of May 26, 2023, I have not received responsive records from the CFB. The

DSNY Foil Officer, however, did respond that while the DSNY has no official policy, its unofficial custom is to obtain the campaign's address information from the CFB or the Board of Elections (BOE).

The summonses were issued to my mother. Since my mother lives in Westchester and has *never* voted in NYC, the BOE would not have had her name on file. The BOE would not have known her first name was Mary or that she was the Treasurer of the campaign. Therefore, it can be inferred that the DSNY dealt with the CFB. Since The_CFB had my mother's correct address information on file at that time, according to the FOIL request that the CFB did answer, the CFB provided the wrong address to the DSNY deliberately. By doing so, I received the summonses after the fundraising period had passed. That is what led to the excessive fines and the cruel and unusual punishment and the deprivation of my constitutional rights.

Under New York law, a person initiates a malicious prosecution when he plays an active role in the prosecution, such as giving advice or importuning the authorities to act, which The_CFB did. I regularly received notices from The_CFB about sanitation and illegal postings. The_CFB was intimately involved in this process. Moreover, The_CFB provided the wrong address to the Department of Sanitation, which caused me to have to appear in court without an attorney, because of another deprivation of constitutional rights. The_CFB provided the DSNY with the wrong address to issue the summons.

*Actual Malice:*

These summonses appeared after I had already filed a Summons and Complaint against the CFB and provided oral and written testimony against The_CFB in its publicly posted post-election review. We were already in the midst of litigation and were in a contentious relationship.

| **ACT TEN** | **Date of Occurrence:** | **On or about March 5, 2021** |
|---|---|---|
| | **Date of Discovery:** | **October 21, 2021** |
| | **Place of Occurrence:** | **Kings County, Queens County, Richmond** |
| | | **County, New York County, and Bronx County** |

**FACTS:**

The_CFB infringed on my U.S.C. Section 1981 and 1983 First, Fourth and Fourteenth Amendment rights. "Under the color of law," The_CFB restricted my protected speech, interfered with my business and my employment contracts, denied my right to due process and treated me differently than other similarly situated candidates based on race and sex therefore denying me equal protection under the law. I was subjected to an unlawful seizure of my space, the insurance premiums I made to my employees' disability and workers compensation insurance, and my personal vehicle.

*Space:*

I am a sole proprietor, a physician, scientist and laboratory director, and an individual authorized to work with radiation and radioactive substances at 111 John Street, New York, NY 10038. My office space and surgical procedure suite were leased jointly to Devi Nampiaparampil and to Metropolis Pain Medicine PLLC d.b.a. Devi Nampiaparampil, MD.

In The_CFB's mandatory training sessions, The_CFB stated that individuals working "from home" could use their space freely without listing rent as a campaign expense. They did not specify whether these candidates had to be named on the lease or whether or their "homes" could be owned or possessed by others such as their spouses, romantic partners, parents, or others. They could also use the homeowners'/ lessors' laptops, printers, and all other office equipment freely.

This group of candidates included the unemployed, people employed by corporations who were performing their work duties at home, and presumably sole proprietors who were physically in their homes. Under the color of law, The_CFB told me that I was in a different category. Because I was treating patients face-to-face at my office, I could not work on my campaign at the office. I would have to pay for rent. Otherwise, I would receive a campaign finance violation for the corporate contribution.

The_CFB also told me that– since I was jointly listed as an individual lessee on my office space lease– the campaign would not be allowed to pay rent (a sublease or a licensing fee) to me (the individual or the private practice) in order to work on my campaign at 111 John Street. That would be a campaign finance violation because I would be paying *myself* with campaign funds. The_CFB also warned me

that if I use any of my office equipment in furtherance of the campaign, this would constitute a campaign finance violation.

The_CFB did not ask if my office building was zoned as residential, commercial, or mixed use. The_CFB did not inquire whether I used a laptop or a desktop to work on my campaign.

The_CFB told me the only remedy was for me to not work on my campaign at all while at my office location. At that time during COVID, I was physically at 111 John Street approximately 80-100 hours per week. I cited the IRS which allows expenses such as cell phones to be divided into percentages for personal and business use. The_CFB declared it does not follow IRS rules.

Argument:

The_CFB gave candidates working from home the option to classify their "office" expenses as campaign-related or non-campaign related based on their preferences.

They denied front-line worker small business owners that option. There is no rationally related government interest in discriminating against front-line worker small business owners when it comes to the use of office equipment and the classification of "working from home" expenses. In fact, in winter 2021, the federal government was trying to incentivize front-line workers, not punish them.

There is no rationally related legitimate government interest in incentivizing the use of residential space as opposed to commercial office space for campaigns.

There is no rationally related legitimate government interest in incentivizing the use of a laptop at home vs. a laptop at the office.

For example, if a patient of mine was running for office, that patient could work on his campaign– using his laptop, cell phone, and my wifi– in my office waiting area. Many of my patients and their escorts for procedures did "work from home" in our waiting area during the pandemic. The_CFB would have no problem with this. However, according to The_CFB, if I used my own laptop, cell phone and wifi in my own office space, I would have received several campaign finance violations.

Since I was the only front-line worker and the only physician small business owner in the 2021 Public Advocate race, these rules regarding rent and these threats of campaign finance violations were a pretext for discrimination based on race and sex.

In violation of my Fourth Amendment rights, The_CFB unlawfully seized my office space under threat of campaign finance violations.

*Staff:*

My employees, healthcare workers, offered to work on my campaign. I was ready to pay them. Under the color of law, The_CFB stated that since Metropolis Pain Medicine d.b.a. Devi Nampiaparampil MD had already pre-paid their disability and workers compensation premiums for the year– during COVID– any work they might perform on the campaign would be considered a "corporate" contribution and subject to penalties.

The_CFB unlawfully seized all of Metropolis Pain Medicine PLLC d.b.a Devi Nampiaparampil MD's trusted employees. It barred me from hiring them as employees for "Dr. Devi For NYC."

66

Although I only became more sure on October 21, 2021, I was very skeptical about whether this was a true campaign finance violation.

| **ACT ELEVEN** | **Date of Occurrence:** | **On or about March 5, 2021** |
| --- | --- | --- |
| | **Date of Discovery:** | **October 21, 2021** |
| | **Place of Occurrence:** | **Kings County, Queens County, Richmond** |
| | | **County, New York County, and Bronx County** |

### FACTS:

During the CFB's **mandatory** training sessions, CFB employees stated both that outside of the $6000 that I could contribute to my own campaign (3 times the maximum allowed personal contribution), I could only spend what I had *already* fundraised. This was false. I was allowed to spend money before I had fundraised it, similar to with a credit card. These employees also told me that I could not use my personal vehicle for the campaign. If I wanted to use it, I would have to pay for the garage that houses it. This seemed strange to me as a small business owner who is used to the IRS's method of mileage-based reimbursements and tax deductions.

Prior to the start of my campaign, I had a car for both business and personal use. During one of the mandatory training sessions, I asked CFB employees about using my car to travel around the city. I was told I needed to count the car travel as a campaign expense because I used the subway to commute to work. They told me that I needed to fundraise enough to deduct the cost of the parking garage. At the time, I did not understand what people did if they worked from home or if they were unemployed.

This was a tremendous burden placed on me, which was not placed on any of the other Public Advocate candidates. On October 21, 2021, I found out this rule only applied to me. When I asked Jaclyn Williams to show me how to remove the transactions, she would not show me how. I then followed up by email, and she emailed me back but she would not show me how.

I would have much preferred to pay for my parking garage with my own personal funds. When I gave birth in December 2020 via C-section, I could not breathe effectively while experiencing contractions, perhaps because I had COVID, too, and was being hospitalized and treated for that simultaneously. Subsequently, I developed signs of a blood clot and pulmonary embolism, both of which can be complications of labor, COVID, and surgery.

In the midst of all of this, I continued to work at my private practice, Metropolis Pain Medicine PLLC, which is an equal opportunity employer. As both the CEO and a worker, I gave myself reasonable accommodations to work. I was able to sit down whenever I wanted to. I limited the amount of weight I carried. My employees could assist me if I needed help. I had my private office where I could keep an electric breast pump to produce breast milk for my baby and a fridge in one of our work rooms.

In 2021, the petitioning period was approximately one month and approximately 2000 signatures were necessary. To accomplish this task without my car, I had to stand on my feet for 10-14 hours a day walking 10-20 miles a day up and down walk-ups in freezing cold weather to petition. It was often below freezing at that time and I had to walk around without gloves to help people sign the petitions. I had severe neuropathic pain from my C-section incision during that time. Neuropathic pain is often precipitated by cold weather and without the car, I had no easy way of warming myself up.

I had to carry between 30-50 pounds on my back because I had to carry all the day's materials on me. As a result, I started urinating blood most likely because either my internal C-section sutures ruptured (my theory) or because I went into rhabdomyolysis and renal failure, a potentially deadly condition. I nearly fainted several times while walking on the street and in the subway.

My baby was deprived of breast milk— because even if I could have carried the additional weight of the breast pumps, and even if I wasn't afraid of publicly breastfeeding on the street or subway platform, and even if I could produce breast milk in these stressful conditions, I had no effective options for refrigeration out on the road. I rarely drank water because there are hardly any public restrooms in these counties. If I had been allowed to use my own money on my car as a personal expense— rather than as a campaign expense— I could have had reasonable accommodations for my situation. I would have had some place to sit down. I could have driven from place to place. I would have had a place to breast pump. And I could have stored the breast milk in a cooler with ice packs as I did with my first child. The_CFB gives its own employees a "Lactation Room" to breastfeed. Because I did not have free use of my car, I could not store my blood pressure pump or cuff (to measure my blood pressure since I had previously had preeclampsia postpartum), breast pump, newborn bottles, plastic nipples, nipple pads, breast pumping paraphernalia, or cooled storage bin (to refrigerate breastmilk) in the car. I could

not carry all these supplies in my arms or on my back without any place to put them down for 10-14 hours a day while petitioning.

The only reason I survived all this at 12 weeks postpartum is because several surgeons and anesthesiologists that I knew rehydrated me and "tuned me up" in the recovery areas of their surgery centers. At the time, I told them what The_CFB told me. One physician thought The_CFB was "inhumane" and asked why a woman who had just given birth needed to march across the city like "Napoleon invading Russia" just to run for office. Everyone believed the truth of what was said except for one anesthesiologist. He also believed I had to forsake my car but he thought CFB employees might be vehemently against the use of gas and fuel and therefore against the use of cars altogether.

As far as the campaign goes, not having the car also prevented me from reaching Staten Island and effectively communicating with any voters there, the borough where I had the best chances of fundraising. Then as part of its audit, The_CFB brought up a potential campaign finance violation in the form of the payments for the parking garage.

I spoke to many doctors about these conditions I was working under to find out what I could do for my baby. My sister fedexed me breastmilk from Florida because she believed my baby, who had been born with COVID, needed the antibodies that could only be found in breastmilk, not in formula, although her breastmilk did not have antibodies to fight COVID, which mine did.

Even if CFB_employees did not know that I had had a clotting issue or a C-section, they knew that I had just given birth. CFB employees sent us baby shower cards and gifts once the baby was born. I kept the cards and gifts. They knew that my husband and I had both had COVID and that we had both been hospitalized. CFB employees sent us "Get Well" messages. My husband posted about the birth of the baby on social media. CFB General Counsel Bethany Perskie may have been aware of the birth of the baby since she was Facebook friends with my husband at the time. Hannah Egerton also had "friends of friends" in common on social media.

Under color of law, The_CFB unlawfully seized my personal vehicle. This unlawful seizure prevented me from acting as an equal opportunity employer and offering reasonable accommodations to anyone with a temporary or long-term disability. As an employer and the CEO of my campaign, I was fully prepared and motivated to offer reasonable accommodations but was barred from doing so by The_CFB's official policies. These policies had a disparate impact based on sex and violated my constitutional right to equal protection under the law. Although the law was misrepresented to me by

CFB employees, these acts occurred under the supervision of Hannah Egerton. The_CFB failed to supervise the actions of its employees in these mandatory training sessions and subsequently in these video conferencing calls.

The_CFB is also in violation of New York's Women's Equality Act and my Fourteenth Amendment/ Right to Procreate.

| **ACT TWELVE:** | **Date of Occurrence:** | **On or about March 5, 2021** |
|---|---|---|
| | **Date of Discovery:** | **October 21, 2021** |
| | **Place of Occurrence:** | **Kings County, Queens County, Richmond** |
| | | **County, New York County, and Bronx County** |

**FACTS:**

When I started my successful small business– my private practice– I set aside money from my savings and secured space, staffing, large-scale medical equipment, office equipment, disposable medical supplies, office supplies, coverage from various insurances, consultants such as accountants and lawyers, and advertising. It was all part of a solid business plan that I had developed. I had to spend money to make money. In this case, the CFB told me to start with between $0 - $6000 (the maximum I could contribute as a candidate to my own campaign) and somehow raise enough to conduct an entire citywide election. This already made me look as though I could not be taken seriously.

The_CFB denied me the ability to use my own space, staff, and personal vehicle to travel for my campaign. This was disparate treatment based on race and sex compared to the other similarly situated candidates running for the same office as me in the same year. I campaigned by myself under dangerous conditions. The_CFB was fully aware of the potential for political violence.

On August 15, 2021, I attended another campaign event unaccompanied. A man, dressed as the Joker, approached me and told me I would be killed at the event if I spoke. He likened me to "the capitalist," Bruce Wayne's father, who the Joker kills in the "Batman" legend. I got on the stage to speak anyway. Within a minute of my starting to speak, a violent protester stormed the stage to attack me, hitting multiple people in the crowd along the way, and ultimately being carried away by the NYPD who was

close at hand. After my speech, the Joker who was still in the crowd pointed at me and pointed at his own eyes. I remained in fear particularly when strangers followed me as I left the event, but I continued to believe I needed to fundraise to have staff accompany me.

On or about March 5, 2021, I went to a mall unaccompanied to collect petitions. While I walked on foot, another individual followed me in a car, honking at me and screaming at me, until finally the motorist tried to run me over until I was able to slip between the cars and avoid being hit. I was in fear of imminent bodily harm.

At another point during the campaign, I went door-to-door by myself when suddenly the resident of one apartment pulled me into the barely furnished apartment, locked it, then chain-locked it, then coerced me into sitting on the bed with them while they drew on my face with lipstick, threatened to kill me, claimed to be the Devil, and asked if I was God, and held me captive there for almost 20 minutes. I was in fear of imminent bodily harm.

I normally take precautions for safety. I live and work on a high floor in high-rise buildings with private security. Metropolis Pain Medicine PLLC has armed security at the front desk. Front entrances are locked after 7pm. Patients and visitors must be registered the night before by the office staff and must check in with photo ID. The office has multiple locks on the front door, physical barriers in terms of the front desk and set-up, video cameras, secret codes to call 911, plans for staff to see patients in multiples, and various other physical safety precautions. Even at home, I take several precautions to ensure our safety. I had to discard these precautions in order to comply with The_CFB's policies.

When I asked for campaign contributions, I was repeatedly met with requests for sexual favors in exchange for the money, comments about how various individuals always wanted to "f-ck a doctor," people's fantasies about "exotic" Indian and Thai women (since I was occasionally mistaken for Thai descent) and requests to visit my medical office, Metropolis Pain Medicine PLLC, after-hours. These events both humiliated me and placed me in fear of bodily harm.

On another occasion, an individual with a political agenda who was not registered as a patient appeared at the medical office building, attempting to gain entry to Metropolis Pain Medicine PLLC, but was stopped in the lobby by the building's armed security. This event placed me in fear for my safety and the safety of my staff, and patients.

On July 1, 2021, I attended a campaign event alone where I spoke to a crowd. I had to attend alone because of the timing. I could not bring my employees with me and my husband and other family members were rotating watching our two children. At the end of the event, a man who had clearly been drinking alcohol shook my hand, held on to it for too long, and ultimately tried to crush it. He followed me around, interjected himself into the small groups that I spoke to, and stared at me. I moved around several times to try to lose him in the crowd. When the crowd thinned out, he reappeared, cornered me, grabbed me, groped me, demanded I kiss him, pinned me against a table, and continued molesting me while I tried to fend him off primarily using my right arm and right hand, which both were injured during this time. Two other men appeared, shouted at me, and formed a semi-circle around me. A fourth man appeared to be recording all of this on his cell phone. A fifth man appeared but scurried away when he was ordered to by one of the other men. A sixth and seventh man appeared and looked stunned, at which point the first man loosened his grip and I was able to push him back, escape to a different part of the event where there were more people, then run out into the street, wait in the intersection in the rain, call an Uber, and once in the Uber call another physician for help for my injuries because I had a difficult time assessing them due to the severe pain in my arm– even though I myself specialize in Sports Medicine.

Once I was in the Uber, I called my friend– another sports medicine specialist. I told her how stressed out I was that a stranger had shot a video of me– a married Indian-American woman– standing inside a semi-circle of white men, kissing one of them. The man had told me he would let me pass if I just kissed him. The video could be edited to stop right there. It could be edited so that the sound was cut out so people wouldn't hear the other men screaming at me and threatening me. Someone could add on a meme saying I was about to have a drunken orgy.

I told her how my entire family– including my husband, children, and parents– would be ruined and shamed in the Indian community. My parents were in their 70's and 80's. They would be completely destroyed. I could also have problems even in my regular professional life if the patients saw this video.

My physician-friend told me these men might not post the video if they thought it was too "G-rated" for their audience since there was no nudity or sex. She was more concerned with The_CFB's rule about why I couldn't pay my employees to accompany me to events, and why I had to go to these dangerous events by myself. Even though I believe I called her about my arm, either I don't recall what she said about it. Or I forgot to ask her.

For about a week after the attack, I could barely move my arm, which meant we had to cancel all the spine procedures, nerve blocks and joint injections because I am right-handed. I couldn't lift my baby safely so my husband and I got into a few conflicts because he didn't understand why I wasn't helping

as much. I didn't want to tell him that I injured my arm or explain how. Instead, I combed my emails, the office emails and the campaign emails. I listened to my staff as they answered the phone. I stayed up at night every night wondering how these men would try to contact me since I figured they would try to blackmail me for money with the video.

I tried to manage my own arm but it was not improving with conservative treatment. Therefore, I called another sports medicine specialist. I still had a hard time moving it at all— even to brush my teeth— and I couldn't sleep all night because of the severe pain when I rolled on to it. We talked about cortisone, viscosupplementation, and platelet-rich plasma. This doctor warned me about the potential for more attacks if these people learned it was so easy to attack someone who was supposed to be running to protect the City. He suggested I take a different approach.

In the meantime, I warned the healthcare providers involved in my campaign that violent agitators, disguised as patients, could book appointments with us and enter our offices and attack us. In my own practice, we started restricting patient appointments and vetting patients to a greater degree. The appointments had to be spaced out far enough that we could figure out if the patient was a real patient or not. I believe other practices started doing the same. We couldn't have security at campaign events, based on The_CFB's rules, but we could keep ourselves safe in our home environments.

Maybe a couple weeks later, my opponent, Theo Chino, asked me how the campaign events were going so I told him what happened to me and what me and my friends were doing to stay safe. Theo pointed out to me that the real consequences of my being attacked were that more New Yorkers were walking around with uncontrolled spinal stenosis, arthritis pain, and cancer pain because of all these restricted appointments. He asked me if— now that it had been some time since I had been attacked, if that seemed realistic to me— that the primary goal of these men at this club was to terrorize a bunch of spine and orthopedic specialists. Theo pointed out that everyone at the campaign event was theoretically from the same party. He asked me to consider the possibility that this was a form of political violence based on race and sex— not a violent protest against doctors.

I went to one campaign event where I saw the man who I believed shot a video of my being attacked. My immediate reaction was to keep an eye on him and to maintain a distance. I didn't know if the other men— or others like them— were at the event, too. But because I was alone again with no security or anyone to accompany me, the man walked over to me with no barriers and greeted me as though we had been friends forever. I thought he might try to blackmail me for money but he didn't. Instead, he called other people over— people I didn't know— and told everyone how great I was, and what a supporter he was of my campaign.

These individuals possessed a video that could damage my image within the relatively traditional culture and among the relatively conservative medical community. But they chose not to harm my reputation. Only The_CFB deliberately and consciously acted to destroy my reputation among an initial blast of 5-8 million people. These individuals damaged my neck and arm, thereby damaging my career, but they appeared to withdraw from that aggressive stance. It seemed they didn't want to indirectly harm the patients that I cared for or the causes I was championing. When they were attacking me, they made it clear they hated me.. did not send gifts and Get Well cards to my home while they simultaneously attempted to destroy my life's work and harm those associated with me. And thankfully, they didn't give me a litany of sanctimonious speeches about how much they had done to help women and minorities like me. These criminals spared me that at least.

One of the men who walked in on my 7/1/21 attack came to my medical office— uninvited— on a weekend when we are normally closed, purportedly to use the restroom. We are not on the first floor and I knew he must have deliberately come here and evaded security in the lobby. He told me that he could help me or harm me with his influence. While he used the restroom, I unsheathed one of the #11 blade surgical scalpels in my procedure suite. I constantly had to be on the lookout for threats.

By July 2021, I had fundraised enough money to start using my car to travel to events– based on The_CFB's misrepresentations. That made it safer to travel to events, but it was still stressful leaving events since I was still traveling alone. Often, men I didn't know walked me to my car under the auspices that they were protecting me from other potentially dangerous individuals. But because I couldn't tell if the person escorting me was dangerous or not, I was always on-guard. I didn't know if one of them would jump into my car with me or ambush me or attack me.

As part of my digital fundraising campaign, I wrote a letter, which my CFB liaison reviewed: "I have been intimidated, threatened, cursed, heckled, jeered, spit at, flashed, shoved and shadowboxed over the past year– as I rode the subways to treat sick patients during the worst of the pandemic, and even now, by violent agitators and careless bureaucrats as I speak up for what's right. I am not deterred. Over the past couple decades, my focus was on treating combat veterans and other patients with severe pain… After working every day of the COVID pandemic– even when I was in labor and just hours after I gave birth– I too had an awakening. I will fight for what we believe in."

Williams emailed me on September 13, 2021, "If the vendor is paid for any design or production work, you [must] request itemized invoices from the vendor and upload these as additional documentation for

your Bill. You should also maintain samples and/ or finals [sic] copies of the designs or work and upload these additional documentation for your Bill Payment."

Under Section 1983, The_CFB violated my fourth, fifth and fourteenth amendments barring unlawful seizures of property, granting people the right to be "secure in their persons," granting the rights to due process and equal protection under the law. But for The_CFB barring the safety precautions I have taken in my normal life, I would not have been "successfully" physically and sexually assaulted on the campaign trail. But for The_CFB, I would not have limitations in the use of my right arm, which I rely on to perform minimally invasive spinal procedures, to care for my children, and to perform most activities of daily living. The_CFB is the actual and proximate cause of my injuries. The_CFB was fully aware of the risk of an attack and reviewed under campaigns, such as Curtis Sliwa who spent approximately $60,000 on security. They also saw my opponent, the incumbent, traveled everywhere with a police escort. Under Section 1983, government agents can also be held liable for the actions of third parties.

Under Section 1983, the CFB is responsible for violating my right to due process and creating the foreseeable harm that occurred to me as a result of its own actions. In Kniepp vs. Tedder (1996), the U.S. Court of Appeals Third Circuit determined that the "state-created danger" theory is a viable mechanism for establishing a constitutional violation under civil rights law if (1) the harm ultimately caused was foreseeable, (2) the state actor showed willful disregard for the plaintiff's safety, (3) there existed some relationship between the state and the plaintiff, and (4) state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

### INJURIES:

The_CFB damaged my reputation in all of these capacities as well as my ability to work in all of these jurisdictions. The_CFB subjected me to humiliation, political violence and relentless harassment based on race and sex. The_CFB disgraced me and my family in the community.

The_CFB's actions were malicious, willful, and wanton, and show its conscious disregard for my rights. It used government resources to execute coercive tactics on me and deprive me of due process and equal protections under the law. It isolated me from others, made me doubt my world view, undermined my confidence in the public, instilled self-doubt in me by regularly dismissing and denying facts I knew to be true, encouraged the media and the public to discriminate against me, intimidated me with threats of prosecution and the loss of my ability to practice medicine effectively, and regularly controlled my

words, other forms of speech, and actions through its campaign finance rules– both real and fraudulently misrepresented to me.

As a direct and proximate result of the false statements and inappropriate actions by The_CFB, I have suffered damages, including injury to my reputation and credibility, embarrassment and humiliation in an amount to be determined at trial. I have lost time and resources attempting corrective action for The_CFB's wrongdoing.

AT and RT, my dependent children suffered damages, including physical and emotional distress from the alterations in child-rearing. A newborn and toddler are completely dependent on adults for all activities of daily living. They were harmed by the relative lack of companionship and medical attention that could have been provided by their mother, a physician who treats sick and disabled children.

Because Dr. Ascherman and I had overlapping supporters who were familiar with both of our candidacies, and because The_CFB only granted one of us the "Dr." title, people thought I lied about being a doctor– and that I lied about treating patients during COVID. Their support turned to betrayal, anger, and hatred. Politicians have been known to lie about their education and work experience, the most recent and most notorious example of which is George Santos. The_CFB did not acknowledge me as a physician anywhere. The_CFB published Dr. Flores's candidate profile so he could describe his work as a physician. The_CFB deleted my entire candidate profile. I had no means of addressing the disparity between me and Dr. Ascherman.

As a foreseeable consequence, social media trolls bombarded my supporters and me with claims that I had lied about being a doctor, that I had lied about treating veterans, and that I may have lied about much more. I had treated thousands of veterans in my medical career. My research and publications in the *Journal of the American Medical Association* and in *Military Medicine* improved access to medical care for tens of thousands of military service members. But The_CFB's actions caused veterans groups to attack me as a fraud as well. Facebook and Twitter erased all traces of these comments, but not before they damaged my reputation and my career.

Voters accused me of stealing money and social security numbers and blocking a "true man of the people," another one of my male opponents in the race, from winning the election. I had raised approximately $80,000 in one week, the week before the voter guide went out. The week after, I could only raise approximately $1000. Our patient referrals also dropped by a similar percentage of 99% at that time. The_CFB crippled my campaign and my small business.

My medical practice was denied much-needed COVID relief– which we qualified for– because the person screening my application, who lived in New York City, did not believe I was a physician practicing in New York. She told me. I had to provide 27 forms of ID rather than the required 2 forms of ID. That still was not enough to convince her. My employees and I had to reach out to my political opponents, including the State Senator, in order to secure funding to protect my 3500+ patients who would suffer the consequences if I had to close the practice. I had been personally financing and subsidizing the costs of their medical care (as an individual ordinary citizen) during the pandemic.

The_CFB's voter guide has also subjected me to increased skepticism putting me at risk of meritless medical malpractice suits from new patients, other meritless complaints, and hostile work environment lawsuits because my employees, particularly the receptionists, are being harassed by third-parties. I am also bombarded with frivolous meritless complaints that I have to spend time and resources reviewing and/ or addressing. One individual– who mentioned The_CFB by name after first coming to me for a spine procedure– reported me to a New York State Agency for some unspecified character flaw. Thankfully, the State saw no reason to even pursue the complaint.

The_CFB interfered with my ability to compete for new employment by damaging my credibility and compromising my ability to secure employment contracts with patients, insurance companies, and other interested parties. This interference crossed state lines as I have patients who reside in multiple states and who travel to see me. I also have contracts with insurance companies based in different states. Aetna, Cigna, Blue Cross Blue Shield, Medicare, United and many others are national, for example. I am also a consultant for universities, corporations and other entities across the country and internationally.

I also own a business, Cytokine Press, LLC, in Maricopa County, Arizona, that has been affected by The_CFB's actions. The_CFB has harmed my interstate commerce in many ways.

Foreseeably, my employees and I have experienced regular and continuous harassing and threatening calls, many replete with hate speech based on race and sex, creating a hostile work environment for all. We had to answer because they could be from patients with urgent medical needs. There were too many harassing calls for four female non-white receptionists to answer all of them. Legitimate patients were redirected to the business's voicemail interfering with commerce. I had to purchase approximately 10 new phone numbers solely for the digital storage capacity. That bought us time to store and listen to all the angry messages so we could locate patient calls.

Facebook and Twitter understood how harmful it could be to me personally and professionally if people– especially patients and campaign donors– thought I lied about being a doctor. The_CFB, which had an actual duty as a publisher reviewing, censoring and co-authoring candidate profiles, should have removed its misleading and defamatory "badge of infamy" voter guide post immediately. Instead, CFB General Counsel, Bethany Perskie reviewed affidavit after affidavit from me detailing the damage The_CFB was doing to my medical career. Rather than removing or modifying the post, The_CFB has kept the post visible online– to do the maximal damage possible– to my medical practice by making people continue to question whether I am truly a doctor or not. The disparate "Dr. Jeff Ascherman" and "Devi E. Nampiaparampil" voter guide profiles are online for view and comparison as of April 23, 2023. Perskie has rebuffed every attempt I have made to correct this problem and emailed specifically that "we" [The_CFB] will not respond to any inquiries about the post.

Since The_CFB did grievous harm to my reputation, I will note what my reputation was before The_CFB published its voter guide and labeled me with a degrading "badge of infamy" while depriving me of my constitutional right to due process.

My Background and Reputation **PRIOR** to the Voter Guide:

I have three government-issued professional licenses: as a physician, a laboratory scientist, and as one who works with radiation and radioactive substances. I have four board-certifications as a physician. Since 2015, other physicians have voted me on to the Castle Connolly list of Top Doctors in the country. I have over 60 publications including over 20 in the Journal of the American Medical Association (JAMA), one of medicine's most esteemed journals. I was accepted from high school directly into the seven-year combined BA/ MD program at Northwestern University and then completed my internship, residency and fellowship training at Harvard Medical School where I was the only woman in my residency class and the only woman in my fellowship class. I have been ranked by my professors, now peer network, as being in the top 5% of alumni from the Harvard Medical School residency program. I perform minimally invasive spinal procedures, joint injections and nerve blocks for refractory pain.

I am a successful small business owner and have had a 50% or more ownership/ partnership stake in multiple small businesses registered in multiple states, including: Metropolis Pain Medicine in Westchester County, New York; Cytokine Press LLC in Maricopa County, Arizona, and Muscle and Nerve Pain Specialists PC in Cook County, Illinois.

I served as a medical expert witness for numerous entities including Health and Hospital Corporation/ The City of New York, Walmart, LabCorp, Alphabet (Google), Mount Sinai (New York), Northwell (New York) and New York Presbyterian, among others. I served as an expert witness and consultant for law firms including but not limited to Jones Day, Keller Drye, Fox Rothschild, Landman Corsi, Wilson Elser, McAloon Friedman, Kline Specter, Aaronson Rappaport, and others.I also consulted for companies including Allergan (Abbvie), Konica Minolta, Doximity, Elan Pharmaceuticals, and others.

I am an Associate Professor at NYU Grossman School of Medicine. I have been on faculty since 2010. I previously taught as an Assistant Professor at Dartmouth Medical School (2008-2009) and as a Fellow at Harvard Medical School (2002-2007).

As a journalist, I published in multiple forums. Newsweek published my feature article on the death penalty as its home page/ landing page/ cover story. As a broadcaster, I appeared in over 500 national news segments for CNN, MSNBC, Fox News, CNBC, Fox Business, HLN, the TODAY Show, The Dr. Oz Show, CBS This Morning, Inside Edition, NBC News, and Fox 5 New York. I previously served as Fox 5 NY Medical Contributor. I also served as an on-air medical contributor for ITV's "Good Morning Britain." My first paid job was at MSNBC.

As a movie director, I directed and produced "A Life For A Life: One More Today" and won a Jury Award from the Directors Guild of America.

As an actor, I appeared as a doctor on "General Hospital" before becoming a doctor in real life. I became a voting Screen Actors Guild/ American Federation of Television and Radio Artists (SAG-AFTRA) Union member in 2008.

As a paid print model, I worked for different entities including the Port Authority of New York/ New Jersey.

As a politician, I was at the top of the ticket in a citywide election for NYC Public Advocate. I had an 8:1 voter disadvantage and an almost 11:1 funding disadvantage after The_CFB funded my opponent, the incumbent, with $1 million. Political operatives estimated I could secure between 9-11% of the vote if I successfully captured my entire "base." Instead, I secured almost 24% of the vote, an 8-point

advantage over the last nominee from my party. I achieved the highest percentage and the highest number of votes obtained by a challenger for Public Advocate in NYC history.

I have worked in New York, New Jersey, Connecticut, Massachusetts, New Hampshire, Vermont, Maryland, Virginia, Georgia, Florida, Pennsylvania, Ohio, Illinois, Louisiana, Texas, Arizona, California, Washington and Washington, D.C. I also worked in other countries including but not limited to: Canada, Belgium, Italy, Austria, Cyprus, Israel, the United Arab Emirates, China and Vietnam.

My grandmother never finished high school. Yet I became a physician, the first in my family. My family did not have any "connections" in medicine, politics, commerce, journalism, entertainment, or news. Yet I have navigated all of these industries and succeeded– until The_CFB sought to harm me. I am the most valuable "asset" my family has.

-------------------------------------------------------------------------------------------------------

## RELIEF SOUGHT:

1. Awarding compensatory damages for my time wasted in an amount not less than $2.7 million based on the City's prior contracted rate with me of $675/ hour and an additional $1.5 million based on the direct costs of printing the voter guide. Perskie herself attested to this number.

2. Awarding past, present and future compensatory damages, based on the reputational harm and the functional losses in my right arm, for an amount to be determined at trial

3. Awarding punitive damages to the maximum extent permitted by the law

4. Awarding all legal expenses and Court costs, including attorneys' fees,

5. Awarding interest on the above amount,

6. Ordering The_CFB to pay Dr. Nampiaparampil for time and labor spent addressing nuisance complaints from those who now believe she is a fraud and an unprofessional physician

7. Ordering The_CFB to serve as a primary insurer, with no premiums, for all future litigation against Dr. Nampiaparampil including but not limited to medical malpractice claims, hostile work environment claims, cybersecurity claims and general business claims such as slip-and-fall

8. The_CFB must add the "Dr." title to my name on its website and add the rest of my full profile with tags on to my online web profile

9. The_CFB must put my video voter guide on YouTube. It must add the title "Dr." to my name in the video. It must add the search tags "Devi" "Nampiaparampil" "DoctorDevi" "Dr. Devi For NYC" "Public Advocate" "2021" and "New York" to the video

10. The_CFB must remove my search tags "Devi" "Nampiaparampil" "DoctorDevi" "Dr. Devi For NYC" regardless of capitalization/ case from any other videos (ex. Jumaane Williams' video content)

11. The_CFB willfully betrayed its duty to the public. Moreover, it willfully tried to deprive the public of a doctor and penalized the campaign supporters who were mostly scientists and healthcare providers in the worst days of a worldwide pandemic. This shows a deliberate indifference for public safety. Punitive damages are appropriate on the involved individuals.

12. I respectfully ask for any other relief this Court deems appropriate



Devi Nampiaparampil



May 8, 2023

Dear Ms. Willemin,

I am both the Candidate and the Treasurer for the campaign "Dr. Devi For NYC." I ran for Public Advocate in 2021.

The Campaign submitted all Statement Disclosures in a timely manner. All of the concerns raised by the CFB throughout the 2021 election cycle were addressed in real-time. Prior to the issuance of the Draft Audit Report, the Campaign appeared to have zero (0) outstanding campaign finance-related issues.

It has been my understanding that if I hire any outside consultants, accountants, or lawyers to assist me with my response to this Draft Audit Report– while my Campaign lacks the funds to pay these professionals with knowledge and expertise– then I will be even further past the maximum allowed contribution to my Campaign. Even if they volunteered to help me, I would be penalized for their in-kind contributions. That would subject me personally to additional campaign finance violations and penalties. Since the fundraising period ended in late 2021/ early 2022, approximately ten (10) months before I received the Draft Audit Report, my Campaign was not able to fundraise to address this issue. That has placed me and the Campaign in a very difficult position.

I have addressed the 75+ new campaign finance concerns raised on the Draft Audit Report below to the best of my ability as a first-time Candidate.

Sincerely,

Devi Nampiaparampil, MD, MS

1

 Gmail



# Follow-up about name in the Voter Guide

David Duhalde-Wine <DDuhalde@nyccfb.info>
To: "devichechi@gmail.com" <devichechi@gmail.com>

Mon, Sep 20, 2021 at 3:52 PM

Dear Devi Nampiaparampil:

The Campaign Finance Board cannot change your name in the general election Voter Guide based on our rules. Furthermore, on July 20th, and in subsequent reminder emails, we sent the following paragraph in the instructions:

### NAME

Enter your name as you would like it to appear in the Voter Guide. You may use a nickname (such as Al instead of Albert, Jim instead of James, etc. for your first name). This section is just for your name — do not include any honorifics (such as "Dr.", "Esq.", or "Reverend") before or after your name. These will not be published in the Voter Guide, and will be deleted if you enter them. Note: You may describe any advanced degrees or religious affiliations in the "Education" or "Organizational Affiliations" sections.

Therefore, your name will appear as Devi Nampiaparampil in the print version of the Voter guide. It would be against current CFB policy to ever included "Dr." regardless of the name filed with BOE.

Thank you,

David Duhalde



Senior Candidate Services Liaison

New York City Campaign Finance Board

www.nyccfb.info | @NYCCFB | Campaign Finance Handbook

**I am currently working remotely. Book an appointment for an audio call here: Bookings link**

*Note: Candidates may rely on guidance given by Board staff; however, it is incumbent upon the candidate to strictly adhere to such advice in order to ensure compliance. The Board will determine your campaign's legal compliance and payment status upon a review of its disclosure statement filings and/or post-election responses*


## Follow-up about name in the Voter Guide

**Devi Nampiaparampil** <devichechi@gmail.com>
To: David Duhalde-Wine <DDuhalde@nyccfb.info>

Thu, Sep 23, 2021 at 2:45 AM

Hi David,

It seems like it would be very confusing to voters if the voter guide, which is supposed to assist voters, listed my name very differently than the actual ballot. "Dr." is missing and "Elizabeth" is missing. Can you send me the exact reference for the law, protocol, or policy where this paragraph (below) comes from? And if it's a policy, is it based on a law? And how often has it been around?

Best,
Devi
[Quoted text hidden]
—
Sent from Gmail Mobile

 Gmail

## Follow-up about name in the Voter Guide

**David Duhalde-Wine <DDuhalde@nyccfb.info>**
To: Devi Nampiaparampil <devichechi@gmail.com>
Cc: VGSA <VGSA@nyccfb.info>

Fri, Sep 24, 2021 at 2:43 PM

Dear Devi,

We recognize that candidates may wish to use a name which is not the same as the name that they use to register with the CFB. This is why we allow candidates to choose the name that will appear in the Guide. This is a long-standing policy that has been in existence since late last century.

The campaign chose to list the candidate in the voter guide as Devi Elizabeth Nampiaparampil when it made its submission to the CFB on August 3, 2021.

Board Rule 16-02(b)(i)(F) states that candidates must submit their information for the voter guide by the deadline set by the Board. The deadline for submission was August 3, 2021. The campaign submitted its information, including the candidate name, on August 3, 2021. The campaign notified us that it wanted to change the name associated with the statement on DATE. Unfortunately, the request for a change is 45 days past the deadline.

Cheers,

David Duhalde

---

From: Devi Nampiaparampil <devichechi@gmail.com>
Sent: Thursday, September 23, 2021 2:46 AM
To: David Duhalde-Wine <DDuhalde@NYCCFB.INFO>
Subject: Re: Follow-up about name in the Voter Guide

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

[Quoted text hidden]


## Follow-up about name in the Voter Guide

Devi Nampiaparampil <devichechi@gmail.com>
To: David Duhalde-Wine <DDuhalde@nyccfb.info>, aloprest@nyccfb.info
Cc: VGSA <VGSA@nyccfb.info>

Sun, Sep 26, 2021 at 1:29 PM

Dear Ms. Loprest,
Dear Mr. Duhalde-Wine,

I urge you to reconsider my request about the appearance of my name in the voter guide materials. There is a mismatch between how my name appears on the ballot and how it will appear in the CFB's voter guide. We are in the midst of a COVID pandemic, an opioid crisis and a mental health crisis. The BOE has already determined that my name will appear as "Dr. Devi Elizabeth Nampiaparampil" on the ballot. For it to appear as something different in a voter guide that is supposed to help people with their decision-making-- for the "Dr." title in particular to be left out-- might make it seem as though the CFB is trying to steer voters in a particular direction rather than simply comply with the law, which was determined by the 2018 election (Dr. Jeffrey Ascherman). Based on the precedent set by that election, the CFB should never have had a policy forbidding certain honorifics.

I am urging you to correct the mistake now. If the voter guide has already been printed, please consider a separate insert or postcard with my updated information. The video hasn't been published. It can and should be updated immediately.

When I first submitted my materials, I was instructed that I absolutely could not use the Dr. title or the M.D. degree in any of my materials. I complied. The Board of Elections told me the same about the ballot. They cited the law.

Then I argued my own case-- in front of the Board of Elections commissioners-- citing the precedent of Dr. Jeff Ascherman who ran for office in 2018 in addition to various other reasons for the name change. The BOE reversed their decision. Here is the video link of the hearing itself:

https://vimeo.com/606235468

I contacted Dru Gibson immediately about the name change. She replied that she couldn't take any significant actions. Then I contacted my liaison, Jaclyn Williams. I also contacted the generic VGSA email. When I asked for the voter guide name to MATCH the ballot name, the CFB gave two conflicting reasons for the denial. First, the CFB said no honorifics would ever be allowed. When I asked for specifics on what law or policy that decision was based (the BOE was able to mail me a reference to section of the law before they reversed their decision), the CFB changed course.

The CFB then said it was my own fault for not including my "Dr." title before the deadline. If the second reason is the real problem, then that is a communication issue on the CFB's part. Because I did request the Dr. title. I couldn't submit it because of the way the software was programmed. But I handwrote my request on the consent form I signed for the CFB video on August 17th.

I have been consistent throughout because I knew about the Dr. Jeff Ascherman case and I had the ballot from his election as proof. I texted the ballot to Dru Gibson the same day I received her phone number. In my text to her, I explained that it was not clear to me why Dr. Jeff Ascherman was allowed to use his title for his election when I am not. I worked just as hard for my degree as he did.

The CFB had a copy of that ballot on that day itself-- that first day I met Dru. I have CONSISTENTLY requested the name change since April 2021. The BOE and the CFB have delayed seriously reviewing my request. That does not make it my fault that the timing is inconvenient now.

Devi E. Nampiaparampil, MD, MS
Candidate for NYC Public Advocate
Director, Metropolis Pain Medicine
Clinical Associate Professor, NYU School of Medicine
Office: 347-424-4996
www.DrDeviForNYC.com

 Gmail

## Follow-up about name in the Voter Guide

Hannah Egerton <HEgerton@nyccfb.info>
To: Devi Nampiaparampil <devichechi@gmail.com>
Cc: David Duhalde-Wine <DDuhalde@nyccfb.info>

Tue, Sep 28, 2021 at 2:41 PM

Dear Devi Nampiaparampil:

Thank you for providing the details about your request. The below response is on behalf of the Executive Director of the Campaign Finance Board (CFB). As we stated in our previous communications, the CFB will print your name as Devi Elizabeth Nampiaparampil, which matches your initial submission, in our 2021 general election Voter Guide. Moreover, it is our long-standing policy that honorifics such as "Dr." are not included as part of the candidate's name. We hold all candidates to the same standards and cannot make any exceptions.

Secondly, we want to note that your profile in the online and print Voter Guide will only state your name. On August 4, 2021, we informed your campaign that you needed to resubmit your Voter Guide profile and Video Voter Guide script because the original violated Board rules mentioning opposing candidates by name. We provided an extension for your resubmission that was due on August 5, 2021. We did not receive an updated profile, but did receive your revised video script. Because we did not receive an updated Voter Guide submission, we were unable to publish any other information in the print Voter Guide. Your online Voter Guide profile will contain your name and the video you filmed in August.

Sincerely,


Hannah Egerton

Director of Candidate Services

New York City Campaign Finance Board

100 Church Street, 12th Floor

New York, NY 10007

[Quoted text hidden]



# New York City
## Campaign Finance Board

Home / NYC Votes / Voter Guide / State General 2018 /
Meet the Candidates / Member of the Assembly /
District 73 /

AA  🖶  ⌁

English  Español  中文  한국어  বাংলা

# Dr. Jeff Ascherman

**Republican, Reform, Independence**

## Running as Candidate for

State Assembly District 73

AA        🔒 nyccfb.info        ↻

‹    ›        ⬆        ▭        ▢

I, Theo Bruce Chino Tavarez, was a candidate for New York City Public Advocate in the 2021 election year. I am a lifetime member of the Democratic Socialists of America.

I submitted an entry for the New York City Campaign Finance Board's (CFB) printed and online voter guide.

In that submission, I referred to the incumbent for that position, Jumaane Williams, by name. I made various other statements that were considered non-compliant according to the CFB policies.

The CFB called me and emailed me to notify me that what I had done was not compliant with its policies.

I was given approximately one week to make revisions and resubmit my profile.

Ms. Loving, an attorney at the CFB initiated a phone call to me. We spoke on the phone for over 10 minutes. She offered me several options as to how to rewrite my statement so that it could be included in the voter guide that is distributed to the millions of eligible voters in New York City.

Ultimately, the CFB rewrote the voter profile for me. Then the CFB attorney emailed me my statement for my review to make sure I agreed with what she had written. The CFB attorney submitted my profile to the appropriate individuals on my behalf.

Because of the COVID pandemic, the CFB employees were working remotely throughout my race. Because of the CFB COVID policies, I was unable to initiate contact with employees of the CFB by telephone or in-person. I am certain that the CFB initiated all contact with me.

Sincerely,

Theo Bruce Chino Tavarez

Teresa Jimenez
Notary Public, State of New York
No. 01JI6320899
Qualified in New York County
Commission Expires March 9, 2023

State of New York          )
                           ) ss
County of NY               )

On the twenty fifth day of October in the year two thousand twenty one before me, the undersigned, personally appeared Theo Bruce Chino Tavarez personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


## Dr. Devi - Candidate For Lieutenant Governor

**Eric Amidon** <eamidon@gmail.com>
To: Devi Nampiaparampil <devichechi@gmail.com>

Thu, Dec 30, 2021 at 6:12 PM

Dr. Devi - For background, I was Congressman Zeldin's Chief of Staff since 2015 and left that position this year to run his campaign. The committee went through over 50 names and eliminated more than 30 of them from consideration. You were one of the 15 remaining that they were very interested in. I wanted to reach out to make sure that you were still interested. This entire process is very confidential. Hoping you are still interested!

Best,
Eric

On Tue, Dec 21, 2021 at 2:24 PM Devi Nampiaparampil <devichechi@gmail.com> wrote:
[Quoted text hidden]



# OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS

### Hearings Division

## Decision

DR. DEVI NAMPIAPARAMPIL, MD
250 WEST 50TH STREET #27A
NEW YORK, NY 10019

Summons# : 047355271H et al. (11 summonses)

THE NEW YORK CITY DEPARTMENT OF SANITATION,

-against-

IL AS TREASURER TO ELECT DR DEVI NAMPIAPARAMPI

Hearing Date :        6/3/2022

Hearing Location :    Remote

Type of Hearing :     By Telephone

| Total Penalty Amount : | 0.00 | Community Service(Hr): | Not Applicable |
|---|---|---|---|

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047021163K | Dismissed | 11/03/2021 | 2880 FLATBUSH AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons:    0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047021164M | Dismissed | 11/04/2021 | 52-15 METROPOLITAN AVENUE, Queens |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons:     0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047021165Y | Dismissed | 11/05/2021 | 1881 GATES AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons:     0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047021166X | Dismissed | 11/05/2021 | 1881 GATES AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons:     0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355268R | Dismissed | 10/28/2021 | 79-60 METROPOLITAN AVENUE, Queens |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 | Dismissed | 0.00 |

Summons # :  047355271H  et al. ( 11 summonses)          06/03/2022                    Page 2 of 6

Total Penalty for Summons: 0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355269Z | Dismissed | 11/01/2021 | 244-06 81 AVENUE, Queens |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons: 0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355270X | Dismissed | 11/01/2021 | 80-30 244 STREET, Queens |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons: 0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355271H | Dismissed | 11/01/2021 | 1250 METROPOLITAN AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119 . | Dismissed | 0.00 |

Total Penalty for Summons: 0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355272J | Dismissed | 11/01/2021 | 1250 METROPOLITAN AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| | | | | |

| | | | | |
|---|---|---|---|---|
| 1 | AS30 | 10.119. | Dismissed | 0.00 |

Total Penalty for Summons: 0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355273L | Dismissed | 11/01/2021 | 1250 METROPOLITAN AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119. | Dismissed | 0.00 |

Total Penalty for Summons: 0.00

| SUMMONS # | SUMMARY DISPOSITION | DATE OF OCCURRENCE | PLACE OF OCCURRENCE |
|---|---|---|---|
| 047355274N | Dismissed | 11/01/2021 | 1250 METROPOLITAN AVENUE, Brooklyn |

| LINE ITEM | OATH CODE | CODE SECTION / RULE | RESULT | PENALTY |
|---|---|---|---|---|
| 1 | AS30 | 10.119. | Dismissed | 0.00 |

Total Penalty for Summons: 0.00

**Findings of Facts & Conclusions of Law**

Respondent MARY S NAMPIAPARAMPIL AS TREASURER TO ELECT DR DEVI NAMPIAPARAMPIL AS PUBLIC ADVOCATE appeared remotely by Dr. Devi Nampiaparampil on June 3, 2022. NYC DSNY appeared by Christopher Morella, Esq.

This consolidated hearing covers summons numbers 047355271H, 047355274N, 047355273L, 047355272J, 047355268R, 047355269Z, 047355270X, 047021184M, 047021163K, 047021166X and 047021165Y. All eleven summonses were issued to Respondent and charges a violation of NYC Administrative Code 10-119 for lawn signs posted on property that the I/O alleged belonged to New York City. The I/O wrote that the signs stated "DR NAMPIAPARAMPIL FOR PUBLIC ADVOCATE. VOTE NOV. 2."

Petitioner presented no evidence and relied on the allegations in the summons.

Dr Nampiaparampil stated that neither she nor anyone associated with her campaign posted the signs cited in the above-listed summonses. Dr. Nampiaparampil stated that she ran a very small campaign and that the only people who had access to the signs were 4 volunteer campaign workers, and that these campaign workers provided an affidavit indicating that they did not post the signs. (See R1 and R2)

Dr. Nampiaparampil also visited the locations with her small group of campaign workers to confirm that none of the campaign workers posted the signs. (R3)

Petitioner provided no rebuttal evidence and made no arguments in response to Dr Nampiaparampil's testimony and evidence.

I credit Dr. Nampiaparampil's testimony and submitted evidence and find that Respondent has sufficiently rebutted Petitioner's prima facie case; and rebutted the statutory presumption that the signs were posted by the person whose name appears on the signs. I find that without additional evidence or testimony, Petitioner has failed to meet its burden of proof in all eleven cases.

All eleven summonses are dismissed.

| | |
|---|---|
| *Daniel Leung* | |
| 06/03/2022 | 06/03/2022 |
| **David Leung, Hearing Officer** | **Date** |



**EMORY**
UNIVERSITY
SCHOOL OF
MEDICINE

Center for Rehabilitation Medicine
Department of Rehabilitation Medicine

July 17, 2015

Dr. Steven Flanagan, M.D.
Chairman, Department of Rehabilitation Medicine
NYU Langone Ambulatory Care Center
240 East 38th Street, 15th Floor
New York, NY 10016

Dear Dr. Flanagan,

I am pleased that I have been asked to provide a letter of support for the promotion of
Dr. Devi Nampiaparampil to Associate Professor at New York University. I have known
Dr. Nampiaparampil since she applied for residency at Harvard Medical School in 2002, have worked
with her closely during her residency training program, as Residency Program Director, following the
evaluations of the Attending Physicians during her rotations, and have followed the trajectory of her
activities since her graduation. I therefore feel that I have a very broad view of her capacities, and
can speak well to this promotion process.

As you know by her Curriculum Vitae, Dr. Nampiaparampil received her undergraduate in a combined
seven year program at Northwestern University, culminating with her graduation in 2002. She then
completed her internal medicine internship at Beth Israel Deaconess Medical Center, and was
accepted to the Harvard Physical Medicine and Rehabilitation residency training program, beginning
in 2003. She furthered her training with a Pain Medicine Fellowship at Brigham and Women's
Hospital/Harvard Medical School, and further added to her education receiving her Master of Science
degree in journalism at Columbia University Graduate School of Journalism.

During her residency training program, when working with her on my inpatient brain injury unit, as well
as my Musculoskeletal Clinic, I found Dr. Nampiaparampil to be thoughtful, well-informed and
extremely pleasant in all of her professional activities. When rounding on the patients, her
presentations were concise, well-informed, and reflected well on her willingness to prepare and
progress her knowledge of medical issues relevant to this care. She was well liked by the patients,
with a very pleasant and caring interaction style. The feedback from the Attending Physicians at the
other inpatient or outpatient training sites throughout residency training reflected similar positive
impressions. She demonstrated leadership among the residents, at Harvard Medical School receiving
the highest honor that we bestowed upon a Resident Physician, the Manuel J Lipson award. This
award was established to recognize the resident physician who went beyond the parameters
established by the residency training program to progress the field of Physical Medicine and
Rehabilitation during the time of the residency. She was further recognized that same year on a
national level by the American Academy of Physical Medicine and Rehabilitation receiving an award
for outstanding service on a Resident Physician Council, the national representative body of resident
physicians in our field. As a demonstration of the breath of her influence during her residency training
program she received a Harvard Resident Research award in 2006, awarded in recognition of
research completed during her training, and presented at Massachusetts General Hospital on clinical
research day, and receiving an individual award recognizing her clinical research. She was further
recognized by the Massachusetts Medical Society 2nd prize among medical trainees for her research.
Though I had a strong requirement for research among our resident physicians, Dr. Nampiaparampil
clearly distinguished herself as a leader among this stellar group of physicians. Often when Resident
Physicians leave the residency training program, and are outside of the cocoon of that influence,
productivity wanes. This was not the case with Dr. Nampiaparampil as she was further recognized by

the Department of Veterans Affairs for outstanding clinical performance, and contributions to research and education in 2011. On a national level she has demonstrated an interest in continuing education by serving as an Oral Board Examiner for the American Board of Physical Medicine and Rehabilitation. This of course is an honor, and a demonstration of her willingness to provide time to further advance our field.

After graduation from the Residency training program and Pain Fellowship, Dr. Nampiaparampil received a faculty appointment at Dartmouth Medical School in the Department of Anesthesiology, and then to New York University School of Medicine where she now resides. At Dartmouth she was the founder and director of the Pain Medicine Clinic, and founder and director of the Brain Injury Clinic as well as director of the Pain Clinic, demonstrating an enormous degree of energy and breadth of skill. This is truly an impressive list of accomplishments for a young physician. Her clinical accomplishments reflect a breathtaking series of projects where they created systems and programs to assist with care of patients requiring interventional pain procedures within the Veterans Administration system of the New York/New Jersey region, created a logical triage system of care throughout the Veterans Administration VISN, and organized the means for prescribing opioids within that same system and used her skills to enhance the means by which these same medications could be ordered electronically. These are difficult issues to address, and it is impressive that she used her vast degree of skills to accomplish these within the cumbersome bureaucracy of the Veterans Administration system.

Her scholarship is further demonstrated by nearly 50 publications in peer-reviewed journals with the focus on pain, with many of these as first author. She has further contributed with book reviews with her 21 book reviews in JAMA.

She has received and maintained board certification in pain medicine, physical medicine and rehabilitation, as well as hospice and palliative medicine.

As an unusual twist in her ability to advance medical knowledge, Dr. Nampiaparampil has distinguished herself in TV journalism, presenting medical opinion on multiple topics for multiple television stations including NBC, CNBC, MSNBC, Al Jazeera America and Fox news. I have seen several of these broadcasts, and find myself extremely proud of the articulate and erudite means by which she presents medical information to her audience.

In short, Dr. Nampiaparampil has distinguished herself with dramatic energy, intellect, and breadth of vision as a leader in Physical Medicine and Rehabilitation, and beyond. She is among the top 5% of the Resident Physicians that I have trained at Harvard Medical School, and clearly is an enormous asset as a Clinician and Academician at New York University. I have never written a more enthusiastic endorsement of a promotion. She clearly exceeds the standard for this promotion, and would easily be promoted to Associate Professor at Emory University School of Medicine.

Yours truly,

David T. Burke, M.D. MA
Professor and Chairman
Department of Rehabilitation Medicine
Emory University School of Medicine
1441 Clifton Road, Atlanta, GA 30322

January 18, 2022

Dear Ms. Loprest,

I am writing to affirm that I received a $10 bank transfer from Dr. Devi For NYC, a refund for my past contribution.

I am a former New Yorker and a pediatric Intensive Care Unit physician from New York Presbyterian Hospital. I now work in the Pediatric ICU at Rush University Medical Center in Chicago. I have been working longer shifts for extended periods of time since March 2020 because our ICU is filled with sick children with COVID and other life-threatening conditions. I could not leave the ICU to deposit the refund check that Dr. Nampiaparampil mailed me earlier in the fall.

When I first heard that Dr. Nampiaparampil was running for office in New York City, I immediately wanted to contribute. Dr. Nampiaparampil has been a mentor to me throughout my career. When I was a college student, she hired me to perform data entry on a research study that fundamentally protected the rights of the disabled.

I wanted to donate the maximum amount allowed for New York City campaigns but Dr. Nampiaparampil asked me to just do a small dollar donation of $10. Later, when she needed to raise approximately $115,000 to meet the Campaign Finance Board criteria for a televised debate, she asked me for an additional contribution. I immediately donated $2000.

More recently, Dr. Nampiaparampil called me to tell me that the NYC Campaign Finance Board had threatened her with penalties for my $10 over-the-limit contribution and additional penalties for the Zelle transfer. I hope you can appreciate why I was delayed in checking the mail and why I did not deposit the check. Like Dr. Nampiaparampil herself, I have been treating vulnerable patients throughout this pandemic. We are trying to save lives. Please do not punish Dr. Nampiaparampil and her campaign for this minor infraction.

Sincerely,

Joanna Rose Kuppy, MD

RECEIVED NYSCEF: 12/09/2022

Date: January 18, 2022

To:   New York Campaign Finance Board

From:  John Pang, MD
       9449 Imperial Hwy
       Orchard Building C, Suite 329
       Downey, CA 90242
       562-302-2023
       john.h.pang@kp.org

Re:   $10 Contribution

I contributed a total of $2010 to Dr. Devi For NYC. When I contributed $2000, I had forgotten that I had already contributed $10 earlier in the election cycle. I received a refund for $10 from the campaign by online bank transfer. I humbly ask that you not punish the campaign for selecting this method of refund. I am an interventional cardiologist treating patients with acute myocardial infarctions and coronary artery disease. I have seen a significant increase in patients with life-threatening cardiac complications during this pandemic. Online bank transfers are the most convenient way for me to receive refunds.

Every year, physicians around the country vote Dr. Nampiaparampil to Castle Connolly's prestigious list of the best doctors in the country. I wanted to support her in this race—not to be a reason that the ONLY woman of color in the citywide general elections was reprimanded and fined. If there are any questions please do not hesitate to contact me.

                              Sincerely,

                              John Pang
                              John Pang, MD

Case Caption:   **Devi E Nampiaparampil MD et al v. New York City Campaign Finance Board**

Judge Name:   **Dakota D. Ramseur**

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 1 | SUMMONS + COMPLAINT - *Corrected* | Processed | 10/21/2022 | Nampiaparampil, D. (Pro Hac / Pro Se) |
| 2 | AFFIDAVIT<br>Affidavit of Service | Processed | 10/27/2022 | Nampiaparampil, D. (Pro Hac / Pro Se) |
| 3 | NOTICE OF MOTION<br>Notice of Motion to Dismiss | Processed | 11/15/2022 | Perskie, B. |
| 4 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION | Processed | 11/15/2022 | Perskie, B. |
| 5 | EXHIBIT(S)<br>Campaign certification | Processed | 11/15/2022 | Perskie, B. |
| 6 | EXHIBIT(S)<br>Campaign training attendance record | Processed | 11/15/2022 | Perskie, B. |
| 7 | EXHIBIT(S)<br>Campaign Finance Handbook for 2021 election cycle | Processed | 11/15/2022 | Perskie, B. |
| 8 | EXHIBIT(S)<br>Board Rule 16-02 | Processed | 11/15/2022 | Perskie, B. |
| 9 | EXHIBIT(S)<br>Voter guide profile instructions from CFB staff | Processed | 11/15/2022 | Perskie, B. |
| 10 | EXHIBIT(S)<br>Contact record re: updated voter guide profile | Processed | 11/15/2022 | Perskie, B. |
| 11 | EXHIBIT(S)<br>Nampiaparampil Campaign Finance Summary | Processed | 11/15/2022 | Perskie, B. |
| 12 | EXHIBIT(S)<br>10/26/22 email with Summons & Complaint | Processed | 11/15/2022 | Perskie, B. |
| 13 | EXHIBIT(S)<br>10-27-22 email with Summons & Complaint | Processed | 11/15/2022 | Perskie, B. |
| 14 | EXHIBIT(S)<br>Pages from Election Results | Processed | 11/15/2022 | Perskie, B. |
| 15 | MEMORANDUM OF LAW IN SUPPORT | Processed | 11/15/2022 | Perskie, B. |
| 16 | NO FEE AUTHORIZATION (LETTER/ORDER/AFFIRMATION) | Processed | 11/15/2022 | Perskie, B. |
| 17 | RJI -RE: NOTICE OF MOTION | Processed | 11/15/2022 | Perskie, B. |
| 18 | NOTICE OF CROSS-MOTION | Processed | 12/09/2022 | Nampiaparampil, D. (Pro Hac / Pro Se) |
| 19 | EXHIBIT(S)<br>Photos of Friendly Relationship With CFB Employees | Processed | 12/09/2022 | Nampiaparampil, D. (Pro Hac / Pro Se) |
| 20 | EXHIBIT(S)<br>Spouse Was CFB Employee | Processed | 12/09/2022 | Nampiaparampil, D. (Pro Hac / Pro Se) |
| 21 | EXHIBIT(S)<br>CFB Counsel FB Friends With Spouse | Processed | 12/09/2022 | Nampiaparampil, D. (Pro Hac / Pro Se) |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 22 | EXHIBIT(S)<br>Email Conversation with Senator Kavanaugh's Office | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 23 | EXHIBIT(S)<br>CFB Budget 2022 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 24 | EXHIBIT(S)<br>New York State Senate Award | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 25 | EXHIBIT(S)<br>Perskie Affidavit October 20, 2021 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 26 | EXHIBIT(S)<br>Ballot Name Posts | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 27 | EXHIBIT(S)<br>CFB Ballot Name Response | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 28 | EXHIBIT(S)<br>Duhalde Wine Response to Ballot Name | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 29 | EXHIBIT(S)<br>Evidence of Breach | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 30 | EXHIBIT(S)<br>Potential Conflict of Interest | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 31 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION<br>Preliminary; From Pro Se Litigant | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 32 | EXHIBIT(S)<br>Email from David Duhalde-Wine About Voter Guide | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 33 | EXHIBIT(S)<br>Email About Deletion From Voter Guide | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 34 | EXHIBIT(S)<br>Copy of Affidavit from Theo Bruce Chino Tavarez | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 35 | EXHIBIT(S)<br>Email Conversation About CFB Web Portal Failure | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 36 | EXHIBIT(S)<br>Email Conversations About Techincal Problems | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 37 | EXHIBIT(S)<br>Voter Guide: Public Advocate Candidates 2021 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 38 | EXHIBIT(S)<br>Timestamped Tweets on Fundraising | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 39 | EXHIBIT(S)<br>Email to Bethany Perskie, CFB Counsel, October 22, 2021 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 40 | EXHIBIT(S)<br>Email to Bethany Perskie, CFB Counsel, November 1, 2021 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 41 | EXHIBIT(S)<br>Photo I took of the Clown who tried to intimidate me | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 42 | EXHIBIT(S)<br>Email with Jaclyn Williams CFB about parking expenses | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 43 | EXHIBIT(S)<br>Police Report on Subway Assault | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 44 | EXHIBIT(S)<br>Screenshot from C-Smart | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 45 | EXHIBIT(S)<br>CFB Press Release | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 46 | EXHIBIT(S)<br>Emails with CFB About Mandatory Debate | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 47 | EXHIBIT(S)<br>Email Conversation: Nampiaparampil on Television<br>Debate at NY1 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 48 | EXHIBIT(S)<br>Messages from Journalists About the CFB | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 49 | EXHIBIT(S)<br>Email Conversations with Bank of America & CFB | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 50 | EXHIBIT(S)<br>Red Flag Contribution | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 51 | EXHIBIT(S)<br>Letters from Doctors Working During COVID | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 52 | EXHIBIT(S)<br>Copy of Affidavits from October 2021 from Devi<br>Nampiaparampil and Theo Bruce Chino Tavarez | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 53 | EXHIBIT(S)<br>Documentation from David Fish Fall 2021 | Processed | 12/09/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 54 | EXHIBIT(S)<br>Listing of Videos To Be Submitted; Links Now | Processed | 12/10/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 55 | EXHIBIT(S)<br>CNN News Article on Mailer Affecting Nixon Cuomo<br>Primary | Processed | 12/10/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 56 | EXHIBIT(S)<br>Prior Effective Notice: Written Testimony to CFB on 12-<br>16-21 | Processed | 12/10/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 57 | EXHIBIT(S)<br>Law Library Limits For Pro Se Litigants | Processed | 12/10/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 58 | EXHIBIT(S)<br>Comptroller's Office on Notice of Claims | Processed | 12/10/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 59 | EXHIBIT(S)<br>Sanitation Emailing Me Referenced Cases in OATH<br>Court | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 60 | EXHIBIT(S)<br>Nampiaparampil Request to EFile Prior Case | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 61 | EXHIBIT(S)<br>CFB Bank of America Campaign Account Shutdown | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 62 | EXHIBIT(S)<br>Litigation Referrals Ex. Duane Morris | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 63 | EXHIBIT(S)<br>Recruitment As Expert Kline Specter 2011 | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 64 | EXHIBIT(S)<br>Redacted Walmart Jones Day Agreement | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 65 | EXHIBIT(S)<br>Redacted CNBC Email During Campaign | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 66 | EXHIBIT(S)<br>Redacted NBC Universal Email During Campaign | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 67 | EXHIBIT(S)<br>Redacted MSNBC Email with MSNBC President<br>Rashida Jones | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 68 | EXHIBIT(S)<br>CFB's Instructions on Proper Service | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 69 | EXHIBIT(S)<br>CFB Counsel Aware of Both Mine & Theo Chino's<br>Affidavits Since October 2021 | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 70 | EXHIBIT(S)<br>CFB Canceling Appts With Us For No Apparent Reason | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 71 | EXHIBIT(S)<br>CFB Canceling Appt Requests for Assistance | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 72 | EXHIBIT(S)<br>SCROLL OSC Filing Fee Paid in August 2022 | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 73 | EXHIBIT(S)<br>CFB Draft Audit Report of My Campaign | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 74 | EXHIBIT(S)<br>CFB Extension of Audit | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 75 | EXHIBIT(S)<br>Attempt to E File 2021 Case | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 76 | EXHIBIT(S)<br>E File Request Denied by CFB | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 77 | EXHIBIT(S)<br>OATH Court March 2022 Adjournment | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 78 | EXHIBIT(S)<br>OATH Court June 2022 Eleven Dismissals | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 79 | EXHIBIT(S)<br>CFB 2021 Primary Voter Guide Section Blank No<br>Comment | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 80 | EXHIBIT(S)<br>CFB Draft Audit Second Extension | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 81 | EXHIBIT(S)<br>MRI Right Wrist Pre-Attack | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 82 | EXHIBIT(S)<br>MRI Right Shoulder Pre-Attack | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 83 | EXHIBIT(S)<br>MRI C-Spine Pre-Attack | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 84 | EXHIBIT(S)<br>Primary Care Note 2022 | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 85 | EXHIBIT(S)<br>Orthopedics Note 2022 | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 86 | EXHIBIT(S)<br>Natalie Azar Rheumatology Note 2022 | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 87 | EXHIBIT(S)<br>XRay Right Shoulder Post Attack; MRI Pending | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 88 | EXHIBIT(S)<br>MRI Face Pre CFB | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 89 | EXHIBIT(S)<br>Mary Nampiaparampil Hospitalization During OATH Hearing | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 90 | EXHIBIT(S)<br>W9 Filing | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 91 | EXHIBIT(S)<br>FOIL Request and Response by CFB | Processed | 12/11/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 92 | EXHIBIT(S)<br>Directors Guild of America Press Release | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 93 | EXHIBIT(S)<br>Port Authority Modeling Contract | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 94 | EXHIBIT(S)<br>Ardsley High School Yearly Award/ Disability | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 95 | EXHIBIT(S)<br>FBI DOJ Initial Correspondence | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 96 | EXHIBIT(S)<br>Evidence of Disability in High School | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 97 | EXHIBIT(S)<br>CFB Accepting Email Service For Prior OSC | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 98 | EXHIBIT(S)<br>CFB Rent Screenshot | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 99 | EXHIBIT(S)<br>Bill McKenzie Email | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 100 | EXHIBIT(S)<br>Nampiaparampil CV | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 101 | EXHIBIT(S)<br>CT Angiography 2020 | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 102 | EXHIBIT(S)<br>Mark S. Email About Hidden Video to Duhalde | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 103 | EXHIBIT(S)<br>Public Advocate Link to CFB Videos; Dr Devi Video Hidden | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 104 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION AND IN SUPPORT OF CROSS-MOTION<br>Updated Affidavit with Appropriate Document Citations 12-12-22 | Processed | 12/12/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 105 | EXHIBIT(S)<br>IRS Audit 2016, 2017, 2018 Decision Shows No Change | Processed | 12/13/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 106 | EXHIBIT(S)<br>Tenured Employment Starting 2008; Minimum Salary; Left in 2013 | Processed | 12/13/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 107 | EXHIBIT(S)<br>Perskie Article Application of CFB Laws | Processed | 12/13/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 108 | EXHIBIT(S)<br>CFB Aware of Candidates' Reliance on Assistance From Liaisons | Processed | 12/13/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 109 | EXHIBIT(S)<br>Inappropriate CFB 2023 Filing Requirements on Closed Campaign | Processed | 12/14/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 110 | EXHIBIT(S)<br>Evidence of Two Parallel CFB Websites- One Nonfunctional | Processed | 12/14/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 111 | SERVICE ON SUPREME COURT CLERK (GENL. CLERK) W/COPY OF ORDER<br>Order of Transfer to General IAS Part w/ NOE | Processed | 12/14/2022 | Perskie, B. |
| 112 | MEMORANDUM OF LAW IN OPPOSITION TO CROSS-MOTION AND IN FURTHER SUPPORT OF MOTION | Processed | 12/14/2022 | Perskie, B. |
| 113 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO CROSS-MOTION AND IN FURTHER SUPPORT OF MOTION | Processed | 12/14/2022 | Perskie, B. |
| 114 | EXHIBIT(S)<br>Plaintiff's Complaint | Processed | 12/14/2022 | Perskie, B. |
| 115 | EXHIBIT(S)<br>OSC petition (2021) | Processed | 12/14/2022 | Perskie, B. |
| 116 | EXHIBIT(S)<br>Memo of NYCCFB in Opposition to OSC petition | Processed | 12/14/2022 | Perskie, B. |
| 117 | EXHIBIT(S)<br>Proposed Notice of Claim | Processed | 12/14/2022 | Perskie, B. |
| 118 | EXHIBIT(S)<br>Public inquiry for Metropolis Pain Medicine, PLLC | Processed | 12/14/2022 | Perskie, B. |
| 119 | AFFIDAVIT OR AFFIRMATION IN FURTHER SUPPORT OF CROSS-MOTION<br>Rushed Affidavit to Counter New Memorandum of Law | Processed | 12/15/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 120 | EXHIBIT(S)<br>Egerton Email Suggesting Audit Is Not Independent But Retaliatory | Processed | 12/15/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 121 | EXHIBIT(S)<br>General Auditing Principles: Independence of Audit | Processed | 12/15/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 122 | EXHIBIT(S)<br>Explanation of Allegations and Damages in 2021 Case | Processed | 12/15/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 123 | EXHIBIT(S)<br>12-24-22 Demand for 2023 Campaign Finance Filing | Processed | 12/15/2022 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 124 | ORDER - TRANSFER CASE - REASSIGNMENT<br>transfer to Non-city IAS Part | Processed | 12/15/2022 | Court User |
| 125 | LETTER / CORRESPONDENCE TO JUDGE | Pending | 12/15/2022 | Perskie, B. |
| 126 | EXHIBIT(S)<br>Comptroller Personal Injury Notice of Claim | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 127 | EXHIBIT(S)<br>Hearing Transcript October 22, 2021 | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 128 | EXHIBIT(S)<br>Work With the Department of Veterans Affairs | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 129 | EXHIBIT(S)<br>Reference to One of Many Death Threats | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 130 | EXHIBIT(S)<br>Correspondence With DEA | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 131 | EXHIBIT(S)<br>Rule 3.7 Lawyer As Witness | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 132 | EXHIBIT(S)<br>Rule 3.3 Candor Toward the Tribunal | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 133 | EXHIBIT(S)<br>Mr. Rather Than Dr. Nampiaparampil | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 134 | EXHIBIT(S)<br>Screenshots of Voter Guide Submission | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 135 | EXHIBIT(S)<br>Perskie Affirmation 10-20-21 | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 136 | EXHIBIT(S)<br>FOIL Requests | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 137 | EXHIBIT(S)<br>Konica Minolta Contract | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 138 | EXHIBIT(S)<br>Contract With the City of New York | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 139 | EXHIBIT(S)<br>First Case With the City of New York | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 140 | EXHIBIT(S)<br>Harvard Letter of Recommendation | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 141 | EXHIBIT(S)<br>Signed Affidavit 1-19-23 for Comptroller Notice of Claim | Processed | 01/20/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 142 | EXHIBIT(S)<br>CFB Allows "Dr." Title For White Male Republicans | Processed | 01/23/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 143 | EXHIBIT(S)<br>CFB's Means of Presenting Fundraising Data | Processed | 01/23/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 144 | EXHIBIT(S)<br>Rules of the City of New York CFB Chapter 16 | Processed | 01/25/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 145 | EXHIBIT(S)<br>Duhalde Egerton Loprest Citing Ch 16 "Rules" ? | Processed | 01/25/2023 | Nampiaparampil, D.<br>(Pro Hac / Pro Se) |
| 146 | DECISION + ORDER ON MOTION | Processed | 04/14/2023 | Court User |
| 147 | NOTICE OF ENTRY<br>Notice of Entry | Processed | 04/17/2023 | Perskie, B. |
| 148 | NOTICE OF ENTRY<br>AMENDED Notice of Entry and Decision | Processed | 04/17/2023 | Perskie, B. |
| 149 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affirmation of Service of Decision and Notice of Entry | Processed | 04/17/2023 | Perskie, B. |